## NATIONAL LABOR RELATIONS BOARD v. LION SHOE CO.

### No. 3258.

Circuit Court of Appeals, First Circuit.

June 10, 1938.

Lawrence Hunt, Atty., NLRB, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Robert S. Erdahl, and H. Gardner Ingraham, Attys., NLRB, all of Washington, D. C., on the brief), for petitioner.

Joseph B. Jacobs, of Boston, Mass. (Charles J. Goldman, of Lynn, Mass., and Jacobs & Jacobs, of Boston, Mass., on the brief), for respondent.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is a petition by the National Labor Relations Board, hereinafter referred to as the Board, for the enforcement of an order issued by the Board in a proceeding instituted under Sec. 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e), hereinafter referred to as the Act, against the respondent, The Lion Shoe Company, hereinafter referred to as the Shoe Company, a corporation located in the city of Lynn in the Commonwealth of Massachusetts, and engaged in the manufacture, sale and distribution of shoes.

A charge having been filed with the Regional Director of the Board for the First Region, hereinafter referred to as the Director, by a local branch of the United Shoe & Leather Workers' Union, hereinafter referred to as the United, on December 3, 1935, and amended on December 26, 1935, the Director as agent of the Board issued his complaint under Sec. 10(b) of

450

the Act, 29 U.S.C.A. § 160(b), alleging that the Shoe Company had engaged in and. was engaging in unfair labor practices affecting commerce within the meaning of the Act.

The amended charge of the United is as follows:

"Pursuant to Section 10(b) of the National Labor Relations Act, the undersigned hereby charges that The Lion Shoe Company, Allerton Street, Lynn, Massachusetts, has engaged in and is engaging in unfair labor practices within the meaning of Section 8, subsections (1) and (2) and (3) of said Act, in that on or about November 14, 1935, and on divers days and dates thereafter said company has dominated the formation and administration of a labor organization known as the Lynn Shoeworkers' Union by supplying the use of factory rooms free of charge for its meetings, free automobile transportation for attendance thereat by actual and prospective members and officers, and by requiring all applicants for employment at said company to sign an application for membership in said union.

"(Subsection 3) That on November 14, 1935, and on divers days and dates thereafter, said company has discriminated in regard to the hire and tenure of employment of its workers by requiring as a condition of employment that any applicant for work shall sign an application for membership in the Lynn Shoeworkers' Union.

"All of said violations as above set forth are also contrary to the provisions of Section 8, subsection 1, and Section 7 of said Act [29 U.S.C.A. §§ 158(1), 157].

"The undersigned further charges that said unfair labor practices are unfair labor practices affecting commerce within the meaning of said Act."

Upon this charge the Director on January 9, 1936, issued a complaint, on which the hearings were held by an Examiner, and upon his report the findings of the Board were based, in which complaint it was alleged that:

"The respondent, The Lion Shoe Company, in the course and conduct of its business at the Lynn Plant as aforesaid, causes and has continuously caused a large part of the raw material used in the production of boots and shoes to be purchased and transported in interstate commerce from and through states of the United States other than the Commonwealth of Massachusetts, to the Lynn plant in the Commonwealth of Massachusetts, and causes and has continuously caused a large part of the boots and shoes produced thereat to be sold and transported in interstate commerce, to, into and through states of the United States other than the Commonwealth of Massachusetts, all of the aforesaid constituting a continuous flow of commerce among the several states.

"The respondent, by its officers, agents and employees, while operating as described above, from November 14, 1935, down to and including the date of filing this complaint, has dominated and interfered with the administration of a labor organization of its employees known as the Lynn Shoeworkers' Union and has contributed financial and other support thereto and has required and is now requiring all applicants for employment at said Lynn plant to sign applications in said union and did thereby engage in and is thereby engaging in unfair labor practices within the meaning of Section 8, subdivisions (1) and (2) of said Act, 29 U.S.C.A. § 158(1, 2).

"The respondent, by its officers, agents and employees, while operating as described above, from November 14, 1935, and down to and including the date of filing this complaint, has discriminated in regard to the hire and tenure of employment of workers in said Lynn plant for the purpose of discouraging membership in the United Shoe & Leather Workers' Union by requiring as a condition of employment at said Lynn plant that any applicant for work shall sign an application for membership in the Lynn Shoeworkers' Union and did thereby engage in and is thereby engaging in unfair labor practices within the meaning of Section 8, subdivisions (1) and (3) of said Act, 29 U.S.C.A. § 158(1, 3).

"The aforesaid labor practices have occurred and are occurring in commerce among the several states, and on the basis of experience in the aforesaid Lynn plant, and others in the same and other industries, burden and obstruct such commerce and the free flow thereof, and have led and tend to lead to labor disputes, burdening and obstructing such commerce and the free flow thereof."

The Shoe Company filed a motion to dismiss the complaint on the ground that the Act was unconstitutional and in reply filed an answer admitting it is engaged in the production of shoes, but denying that it is engaged in interstate commerce or

that its production and sale of shoes constitutes a continuous flow of commerce among the several states.

The respondent also denied in its answer that it has dominated and interfered with the administration of a labor organization of its employees known as the Lynn Shoeworkers' Union, hereinafter referred to as the Shoeworkers' Union, or has contributed financial or other support thereto; or that it has required all applicants for employment in its factory to sign applications for membership in said Shoeworkers' Union, and is thereby engaging in unfair labor practices within the meaning of Sec. 8(1) and (3) of said Act, 29 U.S.C.A. § 158(1, 3).

The respondent in substance denies in its answer every other allegation contained in the complaint.

Hearings were held on said complaint in the latter part of January, 1936, before a trial examiner designated by the Secretary of the Board, who, on May 2, 1936, made a report of his findings and conclusions of law, and on the 20th day of May, 1937, the Board issued its order in form substantially as follows:

"On the basis of the findings and conclusions of law, and pursuant to Section 10, subdivision (c), of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Lion Shoe Company, and its officers, agents, successors and assigns, shall:

"1. Cease and desist from in any manner interfering with, restraining or coercing its employees, in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act;

"2. Cease and desist from encouraging membership in the Lynn Shoe Workers' Union or any other labor organization of its employees, or from discouraging membership in the United Shoe and Leather Workers' Union or any other labor organization of its employees, by discriminating in regard to hire or tenure of employment or any term or condition of employment, or by threats of such discrimination;

"3. Cease and desist from in any manner dominating or interfering with the administration of the Lynn Shoe Workers' Union, or any other labor organization of its employees, or from contributing financial or other support thereto;

"4. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

"(a) Withdraw all recognition from the Lynn Shoe Workers' Union, as representative of its employees, for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work; and disestablish the Lynn Shoe Workers' Union as such representative;

"(b) Offer to those employees who were on the payroll between September 28 and October 31, 1935, and whose work is now performed by other persons hired since October 31, 1935, immediate and full reinstatement to their former positions, without prejudice to their seniority or other rights and privileges previously enjoyed, notifying them at the time of the offer that they will not be required, as a condition of reinstatement, to (1) relinquish their membership in the United Shoe and Leather Workers' Union, or (2) submit to the terms of the illegal agreement between the respondent and the Lynn Shoe Workers' Union; and place those for whom employment is not available on a preferred list to be offered employment as it arises before any other persons are hired;

"(c) Post notices in conspicuous places on each floor of the factory, stating (1) that the Lynn Shoe Workers' Union is so disestablished, and that the respondent will refrain from any recognition thereof, and stating (2) that such notices will remain posted for a period of at least thirty (30) consecutive days from the date of posting;

"(d) Notify the Regional Director for the First Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith."

In its petition to this court for the enforcement of the above order, the Board set forth:

"(8) That said order is, and at all times since its issuance has been in full force and effect.

"(9) Thereafter on May 20, 1937, the said order was served upon the respondent by mailing a copy thereof postpaid by registered mail to the attorney of record for the respondent at Lynn, Massachusetts.

Proof of such service is filed with the record.

"(10) Respondent has failed to comply with said order of the Board and has failed to indicate any intention to comply therewith, and the Board is advised and believes and accordingly alleges that the respondent will not comply therewith unless and until required to do so by the court.

"Wherefore, the Board petitions this Honorable Court for the enforcement of its order of May 20, 1937; and, pursuant to Section 10(e) of said National Labor Relations Act, is certifying and filing with this court a transcript of the entire record in the proceedings before the Board, including the pleadings, testimony and evidence, findings of fact and said order of the Board.

"The Board prays this Honorable Court that it cause notice of the filing of this petition and transcript to be served upon respondent and that this court take jurisdiction of the proceedings and of the questions determined therein and make and enter upon the pleadings, testimony and evidence and the proceedings set forth in such transcript and upon the order made thereon a decree enforcing in whole said order of the Board and requiring respondent, its officers, agents and representatives to comply therewith."

The issues raised by the complaint and answer are (1) that the respondent in the production, sale and distribution of shoes has affected the continuous flow of commerce among the several states; (2) that the respondent from November 14, 1935, down to the filing of the complaint has engaged in unfair labor practices within the meaning of Section 8, subdivisions (1) and (2) of the Act, by dominating and interfering with the administration of a labor organization of its employees known as the Lynn Shoeworkers' Union, and has contributed financial and other support thereto; (3) that the respondent since November 14, 1935, and until and including the filing of the complaint has discriminated in the hire and tenure of employment of workers in its plant at Lynn for the purpose of discouraging membership in the United by requiring as a condition of employment at its plant in said Lynn that any applicant for work shall sign an application for membership in the Shoeworkers' Union in violation of Section 8, subdivisions (1) and (2) of the Act, 29 U.S.C.A. § 158(1, 2).

■■ Under the decisions of the Supreme Court in the cases of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352, and the case of Santa Cruz Fruit Packing Company v. National Labor Relations Board, 58 S.Ct. 656, 82 L.Ed. ——, decided March 28, 1938, we hold that the Act was within the power of Congress in regulating interstate commerce and that the production, sale and distribution of the respondent's shoes affects the continuous flow of commerce among the several states. The issues raised by the complaint, therefore, are within the jurisdiction of the Board, and if the evidence supports the findings of the Board, its order must be affirmed.

■ According to the familiar rule, upon a review of the orders of an Administrative Board, only questions of law are open for the consideration of this court. The findings of fact by the Board are conclusive if supported by any substantial evidence. If not, or if a fair and impartial hearing does not appear to have been granted by the Examiner or the Board, a question of law is involved.

■ While the Examiner in this case,—who is not a lawyer,—in the receipt of evidence, applied a liberal interpretation of the provision of the Act that abolishes the common law rules of evidence, the rules governing reasonable deductions from evidence are not changed, and there must be some substantial evidence to warrant findings of fact by the Examiner and the Board.

The facts presented by the testimony before the Examiner about which there appears to be no dispute are as follows: The respondent manufactures ladies' shoes of a low grade, employing from 300 to 350 employees during the peak of production in the late winter and late summer. In 1934 it entered into a contract with the United, which is a national crafts union composed of approximately 35,000 members, with autonomous local branches in every craft in each factory in any city where it operates. The several local crafts send three delegates to a Joint Council.

There were six crafts represented in the Lion Shoe Company, each one constituting

a local union with control of its own affairs, but apparently subordinate to the Joint Council so far as drafting or agreeing upon a contract with the employer is concerned.

The contract entered into with the United in 1934 expired by its terms on October 31, 1935. The representatives of the United had several conferences with the officials of the respondent during the latter half of October, 1935, and up to November 8, 1935, but failed to agree to terms for a new contract with the respondent. The officials of the respondent, for some time prior to the expiration of the contract with the United according to their testimony, had decided to move their plant from Lynn, unless a new contract embodying certain changes in the old contract with the United was made. They did not assign this at the conferences in October as a reason for not agreeing to a new contract with the United or an extension of the existing contract, as they feared that the members of the United would refuse to complete the shoes then in process of going through their plant.

The plant was closed down on October 31, and a notice was inserted in the local newspapers that the respondent was to move its plant to another city and the operatives were notified to come and get their tools, which was done. Since the work of the operatives of the Shoe Company ceased by reason of the expiration of the contract with the United and the closing of the factory, it is doubtful whether they are included in the class of employees as defined in Sec. 2(3) of the Act, 29 U.S.C.A. § 152(3).

A committee composed of so-called agents of the United came to the office of the respondent on or about November 8, 1935, and certain provisions insisted upon by the respondent as essential to be included in a new contract between the respondent and the United were then discussed, which provisions, on being presented at a meeting of the United, were all unanimously rejected.

As to the charges of domination of and interference with the organization of the Shoe Workers' Union, and that the respondent has discriminated in regard to the hire and tenure of employment in its plant, there must be some substantial evidence in support of each charge in the complaint to warrant the order of the Board.

The facts leading up to the organization of the Shoe Workers' Union as disclosed by the record before this Court are as follows:

Up to November 8 no suggestion had been made by any one to the management of the respondent that a new labor organization could be formed by some of its old employees; and there is an absolute absence of evidence in the record that any official of the respondent up to this time had taken any action to institute or encourage such a move by any of its former employees.

On November 11, one Barron, an old employee, having heard from what "he considered a reliable source" that the respondent was going to move its plant from Lynn, came to see the officials of the respondent at their factory to inquire as to whether it was settled that they were to move and whether anything could be done to induce them to remain in Lynn and reopen their plant. He was told that they had decided to move and that they could not do any business with the old union in relation to a contract. There was no talk at this interview about the formation of a new union.

He was followed by a Mr. Couhig, another employee, who also sought to induce them to reopen their plant in Lynn; but he testified that the officers of the respondent were not interested in opening up the factory again in Lynn, as they said they had gone too far with their plans for moving their business to change. Both Couhig and Barron then appealed to the vice-president of the respondent and urged him, in justice to the old employees who would be thrown out of a job during the approaching winter, to consider the reopening of the factory. They assured him that they had been talking with some of the employees and that they thought a majority of the old employees (members of the United) were in favor of going back to work. This official explained the difficulties of entering into a new contract with the United, and said the company was through with it. They then asked him: "If we form an independent legitimate labor union with representatives of all the departments in the factory represented, would he consider opening the factory?" The vice-president of the respondent hesitated and finally said: "I will have to talk that over with the rest of the boys (his associates)

* * * If agreeable with the rest of the boys, if you can show us where you will be able to get a sufficient number of our employees into an organization that is a legitimate organization, capable of entering into a contract, I will recommend to the rest of them that we will give you that opportunity. *But you have got to show us.*" (Italics supplied.)

This appears from the record to be the first suggestion by any one of a new organization of employees for the purpose of entering into a contract with the respondent, and came from the employees and not from the management of the respondent.

█ These interviews were interpreted by the Examiner and Board as showing domination of its former employees and taking advantage of the economic situation to demand a certain form of agreement, but such a deduction is without any foundation in the evidence. The company was compelled to insist that, if a contract was made with any labor organization, it must represent all the crafts in the production of shoes and in sufficient numbers to ensure production. It would be absurd to expect the respondent to open its factory on any other basis.

A meeting of the old employees of the respondent was held on November 12, but only fifty or sixty were notified in time to attend, and the hall was picketed outside by the agents of the United. After discussion a temporary organization of those present was formed and a committee appointed to confer with the management as to the terms on which they would reopen their factory in Lynn.

At a meeting of the old employees held on November 13, it was suggested that they meet at the factory on the following day, and someone representing the management should state its position, and a representative from the Lynn Chamber of Commerce should be asked to be there. This is the only evidence in support of the allegation in the complaint that the respondent supplied the use of a room in its factory for the holding of meetings by its old employees; but it appears from the testimony that the consent of the management to holding this meeting at the factory was not obtained. The officials of the respondent were notified that a large number of the old employees would be there and would like to have some of the officials of the respondent state its position. Prior to this meeting on November 13, except as to a reduction in wages, the respondent had made no concrete proposition to the new organization, as appears from the testimony of employee Couhig, who was a witness for the Board:

"Q. 149. At this meeting on the night of November 13 you discussed some concrete propositions from the company? A. No, we had no proposition from the company."

The committee appointed by the employees met two of the management officials on the morning of the 14th and reported an agreement by employees attending the meeting the night before to accept a reduction in wages. The management said they were pleased that the shop's crew were willing to co-operate to that extent with them, but instead of encouraging the committee, as found by the Examiner and the Board, the representatives of the management still insisted that they would not enter into a contract unless they were assured that every department would have at least a working basis.

A Mr. Arthur Lalime from the Chamber of Commerce attended the meeting held at the factory on the afternoon of the 14th and spoke, advising them to proceed lawfully and employ counsel to advise them. One of the officials of the respondent, Morris Gass, was also present by suggestion of the committee, and on being called on spoke and outlined fifteen points which the management must insist on being covered in any new contract with any labor organization.

It was finally voted at this meeting that the employees present, who had already formed a temporary organization, should employ counsel to show them how they stood,—whether they could legally form a new union, and, if so, to draft a contract with the respondent. This was done and their counsel, after a conference, advised them that they could legitimately form a new union and drafted a charter and a form of contract with the respondent. The contract was turned over to counsel for the respondent, who drafted a counter form of contract. After conferring and agreeing on any disputed points, owing to the illness of the secretary of their attorney, it was typed in the office of the counsel for the respondent. The fact that it was finally typed in the office of the respondent is also suggested in the Board's decision as evidence of domination by the respondent, which discloses the limits to which the Ex-

aminer and the Board went in drawing conclusions of domination. Obviously no weight could possibly be properly given to these facts as showing domination. The contract with the Shoe Workers' Union was signed on November 20, 1935.

While the Examiner and the Board found that after November 20 conferences were had between representatives of the United and representatives of the respondent and the Chamber of Commerce, counsel for the respondent stated before the Examiner, and one of the officers of the respondent testified, that counsel appeared at these meetings solely for the purpose of explaining the fifteen points which the respondent felt must be insisted upon in a contract with any union, or it would be compelled to move to another city. At a second meeting after November 20 at the Chamber of Commerce, it was suggested that arbitration should be agreed upon to settle the differences with the old union, but they were notified by counsel for the respondent that it had a binding contract with the Shoe Workers' Union. Arbitration appears to have been agreed to by the representatives of the United at this meeting, but, contrary to a statement by the Board in its decision, it does not appear from the record that the respondent agreed to arbitrate its differences with the United; and the next day the United was definitely notified that any proposition of arbitration was rejected by the respondent.

The reason for the insistence on the fifteen points as explained by one of the officials of the respondent clearly shows that they were reasonable in view of their past troubles with the United. They were summarized as follows:

(1) Reduction of the number of union agents with whom respondent had been dealing from six to three to settle major complaints.

(2) Minor complaints to be adjusted by the shop stewards in the shop, to be elected by crew in secret ballot.

(3) Saturday A. M. work when necessary, for eight weeks during each six months, as provided in the NRA.

(4) Right to employ help if member of Union; confirmation of membership within twenty-four hours.

(5) Firm to determine method of production and the right to eliminate all unnecessary operations.

(6) Right to employ temporary help when necessary.

(7) Right to shift help from one operation to another within the same craft.

(8) Prices on new work to be based on similar work within the factory, or in other Massachusetts factories.

(9) No new working rules without consulting employer within the life of contract.

(10) Right to make "compo" shoes if desired, with right to train help to make same; prices on operations on compo shoes to be based on prices of similar work in other Massachusetts shops.

(11) Arbitration agreement which shall be final and binding on both parties.

(12) No overcrowding of jobs in any one craft.

(13) Contract to expire on October 31.

(14) Reduction of 15 per cent in all wages and prices of piece work; 5 per cent to be rebated at end of year.

(15) Elimination of business agent of Local 5 from factory, except with President of Joint Council.

It was conceded by Thornton, the president of the Lynn Joint Council, representing the United, that at least fourteen of the points were reasonable and should have been conceded.

This being so, the deduction is not warranted that the insistence upon them and that the granting of them by the new union disclosed domination on the part of the respondent. The respondent must have had the right to demand a contract that would permit it to do business at a profit, or if not acceded to, to liquidate, or move its factory to some other location where the labor conditions were more favorable.

The court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, said:

"The Act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.' * * * The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its

authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."

It is found by the Examiner and so stated in his report that the management of the respondent had no intention of moving its plant from Lynn, because its officials had not, up to the time of negotiating with the Shoe Workers' Union, bought or rented a factory elsewhere, but it appears in the record that its officials had already looked over possible locations in several Massachusetts cities and had decided upon either Melrose or Beverly. October, November and December, according to the record, were slack periods of production in the respondent's business, and a favorable time for moving its plant, if it decided to move. In any event, the burden of proving that the alleged plan of moving the factory from Lynn had no basis in fact was on the complainant. That it had decided on one of two locations in either Melrose or Beverly was uncontradicted. No other evidence than the fact that the respondent, prior to entering into negotiations for a contract with the Shoe Workers' Union, had not actually bought or leased a factory elsewhere, was offered by counsel for the Director to support the finding which alone under the circumstances would not warrant the deduction that the management of the respondent had no intention of moving its plant.

As further evidence of domination, the Examiner in his Intermediate Report and the Board in its decision found that the officials of the respondent aided the new union with financial and other support. There is not the slightest evidence of this, or any evidence from which such a deduction could reasonably be drawn.

■ The use of an automobile of the respondent to bring employees to the factory was no different from the practice before operations ceased under its contract with the United. When an employee in one of the crafts failed to appear, it became necessary to go out and locate a substitute, and the company's automobile was used. It is common knowledge that irregular employees in shoe factories seldom have telephones in their rooms or residences, or own automobiles. There is absolutely no substantial evidence that the company's automobile was used to bring employees to any of the meetings prior to or including November 20. After the contract with the new organization was signed, the respondent surely had the right to seek employees to do their work and in emergency to furnish transportation.

It is also cited in the Examiner's report and in the Board's decision that the officials of the company urged the old employees of the company again to become employees of the respondent, and join the new union, but the evidence discloses that any suggestion of this nature was made after the contract with the new union was in effect, when they had a right to add to their force of employees and comply with the new contract.

The activities of a Mrs. Thornton, a forelady in the plant, were also cited by the Board to the effect that the respondent was actively engaged in fostering the new union, but there is no substantial evidence in the record to support such a finding. It was denied by Mrs. Thornton, by the officials of the company and by other witnesses summoned by the Director in support of his complaint.

The statement in the Board's decision that Mrs. Thornton was zealous in helping the new union to organize and that she was active at the meeting of the employees on November 14, is also without any substantial support in the record. Mrs. Thornton admitted, after the factory was reopened, she sought out those employees formerly under her to come back to work. It was denied by Mrs. Thornton and by the officials of the respondent that she had talked with any of the officials of the company relating to organizing the new union, or to any of the old employees, prior to the signing of the contract. Nor does any witness testify that she was active at the meeting on November 14. Mrs. Thornton was, of course, interested and attended that meeting, since, as she testified, she had been unable to find work after the factory was closed on October 31. The evidence relating to her advising an old employee that, if she wanted her job back, she had better attend a meeting at Paul Revere Hall, may well have been the meeting at which the contract was signed, which required all employees to become members of the new organization. That it was prior to that meeting is inconsistent with the testimony of witnesses Barron, Goodwin and that of Mrs. Thornton and of the officials of the company, and has no substantial support in the testimony of other witnesses. The burden was on the Director to prove

the charges in his complaint. Vague testimony of her activities, which may have been before the reopening of the factory, should have no weight against positive testimony to the contrary.

Neither is the statement in the Board's decision, that the respondent at all times displayed a lively interest in the new organization, based on any substantial evidence. On the contrary, witnesses Barron and Couhig testified that at first the management displayed no interest in their proposition. It was only after their assurance that a sufficient number of employees would return to work to operate the factory that the officials listened to them. Such a conclusion clearly existed only in the imagination of the Examiner and members of the Board, as was the statement that as soon as it recognized that the efforts of Barron and Couhig were meeting with success, it began openly to urge its employees to become members of the new organization. The instance cited in support of this statement was of an instance clearly occurring after the factory was in operation, and the employee obviously referred to was notified that to obtain a job he would, in accordance with the new contract, have to join the new union. The statement of the employee that he was only seeking for information was not "during the period described," as stated by the Board, referring to the period of negotiations, but after the factory had resumed operations.

As to the finding of the Examiner and the Board that the respondent seized upon the economic conditions to coerce the members of the new union to agree to an unfair contract, Thornton, president of the Lynn Joint Council, testified that at least fourteen of the points insisted upon were reasonable and should have been conceded. It does not appear what the unreasonable one was, nor does it appear from the testimony that the respondent demanded any unreasonable provisions in its contract with either the new or the old union, in view of its past experience with an agent of one of the crafts in the factory.

The Board commented on the fact that at the time of the signing of the contract the Shoe Workers' Union appeared to have had only 62 members, but it also appeared that there was much confusion at the preliminary meetings. They had proceeded up to this time without advice of counsel Many of the old employees, who had been out of work, did not have money to comply with the provisions of the charter of the new union as to an initial membership fee, which at the outset, under the circumstances, was not insisted upon; but by January 24, 1936, at the time of the hearing before the Examiner, there were 175 on the payroll. It appears from the record that it was not even then a busy season for production of shoes or new orders, and the respondent had been delayed by the uncertainty of the conditions in Lynn of seeking orders for business.

The negotiations between the respondent and the new union were initiated by its former employees and members of the United, and not by the respondent, and were fair and helpful in furnishing work to labor in the city of Lynn, which cannot be said of the acts of certain members of the old union in instigating riots, in making threats and so far committing acts of intimidation as to cause postponement of the meetings of the new union for fear of violence.

As to the second ground for finding unfair labor practices, viz.: of discrimination as to hire and tenure of employment, since there is no substantial evidence that any unfair labor practices were employed by the respondent in connection with the organization of and its contract with the Shoe Workers' Union, it therefore had the right under Sec. 8(3) of the Act, 29 U.S.C.A. § 158(3), to enter into a "closed shop" agreement with the new union, and to insist that all employees should join the new union.

That the new union, when finally organized, constituted a unit for collective bargaining with the respondent under Sec. 9(a) of the Act, 29 U.S.C.A. § 159(a), is clear, and its representatives designated or selected for bargaining with the respondent represented every member of the new "unit appropriate for the purpose."

A closed shop is permitted under the Massachusetts statutes, and Sec. 8(3) of the Act, 29 U.S.C.A. § 158(3), provides:

"That nothing in this Act [chapter] or in [the National Industrial Recovery Act, U.S.C.Supp. VII] sections 701 to 712 of Title 15, [as amended from time to time], or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act [chapter] as an unfair

labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in Section 9(a), [159(a) of this Title], in the appropriate collective bargaining unit covered by such agreement when made."

If, as the court held in National Labor Relations Board v. Jones & Laughlin Steel Corp., supra, that "The Act does not compel agreements between employers and employees," and "it does not prevent the employer 'from refusing to make a collective contract and from hiring individuals on whatever terms'" the employer may determine, there would appear to be nothing in the Act that prevents an employer from entering into an agreement with a labor organization formed of old employees on whatever terms may be agreed upon, no unfair labor practices being used or domination being shown.

Since this court holds that the findings of the Board of unfair labor practices in the organization and administration of the Shoe Workers' Union were without substantial evidence on which to base them, the finding and ruling of discrimination in regard to hire and tenure of employment under the contract with the new union was unwarranted, since its contract with the Shoe Workers' Union was permissible under Sec. 8(3) of the Act.

The order of the Board is vacated.