## BALLSTON–STILLWATER KNITTING CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.

### No. 391.

Circuit Court of Appeals, Second Circuit.

Aug. 1, 1938.

James M. Noonan, of Albany, N. Y., for petitioner.

Robert B. Watts, Acting Gen. Counsel, Lawrence Hunt, Laurence A. Knapp, and Owsley Vose, all of Washington, D. C., for respondent.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The case comes before this court, pursuant to section 10(f) of the National Labor Relations Act, 29 U.S.C.A. § 160(f), upon a petition by Ballston-Stillwater Knitting Co., Inc., to review and set aside an order of the Board issued under section 10(c) of the Act, 29 U.S.C.A. § 160(c). The Board's answer requests the court to affirm and enforce its order. The petitioner is a New York corporation engaged in the manufacture and sale of hosiery and sweaters. It has about 900 employees. Its main hosiery plant and its sweater plant are located at Ballston Spa, N. Y.; another hosiery plant is operated at Stillwater, N. Y. About 90 per cent. of the manufactured goods are sold outside the state and are transported in interstate commerce. No question is raised as to the jurisdiction of the Board.

The order complained of was issued April 7, 1938, after extensive hearings be-

fore a duly designated trial examiner at which two labor unions and the village of Ballston Spa, as well as the Board and the petitioner, were represented by counsel. The labor unions, Textile Workers Organizing Committee, which is affiliated with the Committee for Industrial Organization, and Employees Welfare and Protective Association, an unaffiliated organization admitting only employees of the petitioner, hereafter will be referred to respectively as the CIO and the Association. The Board found that the petitioner (1) had locked out its employees from March 27 to 30, 1937, for the purpose of discouraging their first efforts toward collective bargaining; (2) had dominated and interfered with the formation and administration of the Association; (3) had laid off certain employees at its Stillwater plant for the purpose of discouraging membership in the CIO; (4) had discharged certain employees at its Ballston Spa hosiery plant for a like purpose; and (5) that a strike, which was still in progress at the time of the hearings, was caused by the petitioner's discriminatory practices to discourage membership in the CIO and by its domination of the Association. As conclusions of law the Board found that the petitioner engaged in unfair labor practices in violation of section 8(1), (2) and (3), 29 U.S.C.A. § 158(1–3). Its order directed the petitioner to cease and desist therefrom and to take certain affirmative action. It is the contention of the petitioner that none of the Board's findings of fact is supported by substantial evidence.

■ Section 10(e) of the Act, 29 U.S.C.A. § 160(e), provides that "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." Hence this court is not at liberty to review the evidence and make its own findings; but neither is it bound to accept findings based on evidence which merely creates a suspicion or gives rise to an inference that cannot reasonably be accepted. The statute means that the Board's findings are conclusive if supported by substantial evidence. Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989; National Labor Relations Board v. Thompson Products, 6 Cir., 97 F.2d 13, 15; National Labor Relations Board v. Lion Shoe Co., 1 Cir., 97 F.2d 448. This is the yardstick to be applied to an examination of the record.

■ Applying it to the finding as to the lockout of employees, it is clear that that finding cannot stand. On Friday afternoon March 26, 1937, Mr. Mooney, president of the petitioner, found upon his desk petitions signed by 263 employees in five departments of the Ballston Spa hosiery mill, asking for a 15 per cent. wage increase. He immediately caused a notice to be posted to the effect that, since no representatives had been selected to confer with the management, the mill would not open on Saturday the 27th and the foreman of each department had been instructed to have representatives meet with the Company's officers at 2:30 P. M., March 29th. Representatives were selected and that meeting was held. Mr. Mooney stated reasons, which apparently satisfied the employees, why the requested wage increase could not immediately be granted. Throughout the following ten days he held numerous other conferences with representatives of various departments and straightened out special grievances brought to his attention. The mill was reopened at 11 P. M. March 29th, and all workers on the regular payroll were paid the amount they would have earned had the mill not been closed on Saturday and Monday. There is not a word of testimony to the contrary. Instead of proving that the plant was closed for the purpose of discouraging the employees' "first efforts toward collective bargaining", the record proves the exact opposite. It shows that the petitioner was entirely willing to bargain with representatives of its employees. Indeed, counsel for the Board conceded on the argument that the finding as to the lockout could not be supported. With its reversal falls also paragraph 2(c) of the order, which directed the petitioner to make good any loss sustained by its employees during the closing of the mill.

■ During the weeks immediately following the meeting of March 29th between Mr. Mooney and representatives of various departments of the Ballston hosiery plant, there developed pronounced union activity among the petitioner's employees. Some advocated a union affiliated with the Committee for Industrial Organization and asked its representatives to aid in getting members; others circulated petitions for an open shop, and still others circulated petitions for an unaffiliated "inside" union. Feeling in the community apparently ran high and some of the property owners refused to allow their premises to be used as a meeting place for the CIO, but the Board found that the petitioner did not participate

in such discrimination. On April 9th, certain employees called a meeting to promote the formation of an unaffiliated union limited to workers at the Stillwater plant. Sam Jones was elected chairman, and thereafter wrote Mr. Mooney requesting him to meet representatives of various departments of the Stillwater mill. President Mooney again showed his willingness to confer with representatives of the petitioner's employees by accepting the invitation. Solicitation of employees by their fellow employees to form an unaffiliated union also developed at Ballston Spa. On May 9th there was held a meeting of the employees of both the Stillwater and Ballston plants and formal organization of the Association was effected. On the following day the Association's officers presented to president Mooney proof that it represented a majority of the petitioner's employees and requested that it be recognized as their exclusive collective bargaining agent. Such recognition was accorded it. On June 2nd the Association petitioned for a 10 per cent. increase in piece-work wages and an increase of 5 cents in hourly wages. The requested increases, effective June 14th, were granted by the petitioner. The Board has found that the petitioner dominated and interfered with the formation of the Association, and at all times thereafter dominated and interfered with its administration. Clause 2(f) of the Board's order requires the petitioner to withdraw recognition of the Association as representative of its employees and to "completely disestablish" it as such representative.

This is not the case of a "company union" whose formation was initiated by the employer in order to combat the efforts of an outside union to organize his employees. The testimony is uncontradicted that the officers of the petitioner had no hand in establishing the Association. It is true, as the Board found, that the chief reason for its formation was to keep out the CIO, but the plan of an "inside" union was apparently the spontaneous reaction of a group of the employees, who circulated their petitions, got up their own meetings, engaged their own attorney to draft the constitution and by-laws, and paid their expenses, without suggestion or help by the petitioner. Concededly the petitioner made no financial contributions. It is true that the petitions for membership were circulated in the mills without protest by the management, and that employees who attended the April 9th meet-

ting during working hours were not docked in pay. But it is also true that solicitation of members for the CIO occurred, as Ingersoll testified, during working hours. Mrs. Dandareau, a witness not friendly to the petitioner, testified that a notice was posted on the time clock to the effect that it was not necessary to belong to any organization to work in the plant, and several other witnesses said that they were treated no differently by the petitioner after they joined the CIO. That certain CIO members were watched, or believed they were, more closely by the foreladies for infraction of the rules against leaving their machines and conversing is too weak a reed to support an inference of discrimination amounting to domination and interference in the formation of the Association. Nor is the fact that employees who attended the April 9th meeting were not docked in pay sufficient evidence of domination or interference. There was no discrimination between those who favored the "inside" union and those who favored the CIO. No one was docked, because, as the superintendent explained, he thought that if he was liberal and did not interfere with meetings the trouble would blow over. So far as we can see the officials of the petitioner held the scales evenly balanced while the contest for membership in the two labor organizations was proceeding. But it is argued by the Board that certain supervisory employees did not. Pitney, Jones and Baker were the leading spirits behind the April 9th meeting and the solicitation at the Stillwater plant of memberships in the Association, and there is testimony that an assistant forelady at the Ballston plant, solicited memberships among those employees. Pitney was an inspector of bundling, whose duty was to inspect the work completed by the bundlers and give to each a work check showing the number of dozens she had bundled during the day. Her salary was $28 per week. Jones was a machine fixer earning $22 per week. His duties were to repair machines that get out of order, which is a frequent occurrence, and to pass out work checks to the girls employed upon the machines. Baker was also a machine fixer. Each of the three denied any authority to hire or discharge any employee, and this was corroborated by categorical testimony that only the superintendent and the assistant superintendent had such authority. The Board found that Pitney, Baker and Jones transmitted orders from the superintendent and

reported back to him concerning the work and behavior of employees, but it made no finding as to their authority to hire or discharge. Nevertheless, it imputed their conduct to the petitioner. We do not think it follows from the characterization of these employees as "supervisory" that liability for their acts should be visited upon petitioner. They supervised in the sense that they handed out work, inspected, and gave checks to the other employees indicating the amount of work done; but their status was but slightly higher than that of the other employees. Their salaries were only a little greater than that of the rest of the workers and there is no finding that they had the power to hire and discharge. We think it quite certain that they did not possess such power. The machine fixers also performed such menial tasks as washing windows, sweeping, emptying waste, in addition to doing mechanical work in fixing the machines. Under the Wagner Act, such workers as Pitney, Jones and Baker, are employees who are free to organize or not as they choose, and petitioner is not responsible for their acts in organizing the Association and encouraging others to join. There is not the slightest evidence in addition to the conduct of these "supervisory" employees that the petitioner initiated the movement for an unaffiliated union. The most that can be inferred is that superintendent Hathorn knew that "supervisory employees" were circulating membership cards for the Association during working hours, and that he took no step to prevent it. As a matter of law, in our opinion, this does not amount to domination or interference by the employer. There is no evidence that Hathorn would not have been equally lenient with regard to the circulation of petitions for membership in the CIO. Some solicitation for CIO members was done in the mills, although apparently less openly and to a less extent. No request was made for leave to circulate them openly and no demand that the circulation of Association cards be stopped. To constitute domination or interference by the employer we think that it must appear that the employees are acting for him rather than for themselves, or that the employer in some manner gives aid to one group which he withholds from the other, or discriminates in favor of members of a labor organization or against non-members. A union limited to the employees of a single employer is as legal as any other, and we know of no rule of law that forbids the employer to permit his employees to solicit memberships during working hours, provided he does not withhold a like privilege from the opposition and exerts no pressure upon employees to join the union. The Board found that the supervisory employees gave some of the workers to understand that they had better sign with the Association if they wished to keep their jobs. It may be noted, however, that the very few witnesses who testified to such threats were not sufficiently impressed thereby to join the Association. If the persons making such threats had no power to discharge, it is difficult to see any more reason for imputing such threats to the employer than for imputing to him a similar argument made by an ordinary employee in soliciting members. As already stated, the employees were acting for themselves, not for the petitioner, in organizing the Association. There is no evidence that the superintendent or any one else connected with the management, ever knew of the threats so there could be no ratification of them. In our opinion there is no substantial evidence to support the Board's ultimate findings that the petitioner interfered with the employees' rights of self-organization or dominated or interfered with the formation or administration of the Association.

■ During April and May 1937 a number of employees were laid off or discharged, ostensibly for legitimate business reasons. With respect to eleven of such employees the Board has found that the real reason was their union affiliation with the CIO, and has ordered their restoration with back pay. This finding is likewise challenged by the petitioner.

Seven of the discharged employees worked on cotton socks designated as stock numbers 703 and 705. These were the only all cotton socks made by the petitioner and they were exclusively for one customer, the J. C. Penney Company. On April 5, 1937, Mr. Mooney instructed superintendent Hathorn to discontinue these stock numbers, the officers of petitioner having under consideration the making of a cotton sock of finer guage upon a proposed automatic machine. There were then on hand and unsold 42,260 dozen of 703 and 5700 dozen of 705. The Penney Company had placed no order for them since February 1937. Due to the discontinuance of these numbers it was necessary to lay off 48 employees of whom 32 were knitters and 16 were loopers and mis-

cellaneous workers. The lay-offs were staggered between April 9th and April 26th, the first to go being the knitters, as theirs was the first operation. Among the 32 knitters laid off were the seven girls whom the Board has ordered reinstated. They were members of the CIO but there is no evidence that the petitioner then knew that fact, and other knitters laid off at the same time were not members. No discrimination in the lay-offs was shown on account of union affiliation. After it was decided to discontinue 703 and 705, thirty-two machines used exclusively in the manufacture of those numbers were dismantled and removed to a storehouse. The Board has attacked the sincerity of the petitioner's intention to discontinue permanently 703 and 705 because the petitioner continued to negotiate with the Penney Company for orders and in the summer made up some additional socks of 703 and 705 on other machines adjusted for the work. In discussing the negotiations for orders the Board says that it seems extremely unlikely that the petitioner would dismantle its machines for failure to get an order before it was clear that that order was not forthcoming. This argument, however, disregards the large supply of unsold merchandise already made up. Orders secured from the Penney Company subsequent to dismantling the machines were for 21,000 dozen of 703 and 4000 dozen of 705. After filling them the petitioner still had on hand 24,620 dozen of the former and 1700 dozen of the latter. The additional manufacture of 703 was explained as merely to "even up", that is, so that each dozen would have six pairs of brown and six of blue colored socks. As to the additional manufacture of 705 Mr. Mooney testified that this was done because the petitioner received another order for 4,000 dozen of 705, had unspun yarn on hand for which there was no other use, and wanted to keep the girls employed. On August 9th, the superintendent wrote a letter to a worker saying: "We are going to try to get some business on 703 and 705 but first we must know the price we are going to pay for knitting and the other operations in order to arrive at a selling price." The Board drew the inference that the manufacture of 703 and 705 was to be resumed contrary to Mr. Mooney's testimony that the line had been permanently discontinued. But even if that inference be justified, it is pure speculation to infer that discontinuance of manufacture four months before, when there was a large stock on hand and no orders, was merely a pretext to lay off employees who

were affiliated with the CIO, and particularly when others not so affiliated were laid off at the same time. There was no substantial evidence to support the finding of the discriminatory discharge of the seven employees in question.

This is likewise true of the lay-off or discharge of Irving Hurd. He was a drier at the Stillwater plant and was notified by the superintendent on April 16, 1937, that the last shift of driers was being laid off. Hurd was a member of the CIO. Another man who was laid off at the same time was also a CIO member. The latter was the oldest drier in point of service, and was called back a week later. Hurd was not called back. An employee of less seniority who later took his place was also a CIO member. The Board notes that Hurd's membership was the most conspicuous of the three because he was a committee member, but there is no evidence that the petitioner knew this fact, or, indeed, that it knew the union affiliations of any of the men. Hathorn testified that when he laid Hurd off, he did not intend to put him back at drying because he was always in argument with the other driers. The Board says that "whether or not Hurd was argumentative, laying him off for this reason was discriminatory." This presupposes that his arguments related to union matters, but there is nothing to support this supposition. Hurd himself testified that he talked little about CIO matters at the plant. He was accustomed to come to work early, loiter in the boiler room and get into argument with the workers there. Hathorn, Jr., the assistant superintendent, gave him special instructions not to come to the plant until it was time to report for work and to enter by a separate entrance. It was the violation of these instructions which led to the superintendent's decision not to recall him as a drier. No connection was established between his membership in the CIO and his discharge, and the inference of discrimination against him cannot be supported.

Dorothy Dandareau and Agnes Coon were laid off May 3, 1937, with seven other bundlers. About this time there was a general lay-off of 29 employees scattered throughout the finishing department. The petitioner presented evidence that the lay-offs were caused by lack of work and that the seniority rule was observed in making them and in recalling the workers. Eight of the nine bundlers were called back to work during June. Coon was not recalled

because she had the lowest seniority rating. Dandareau was notified by letter to return on June 1st, but testified she never received the letter. Both Coon and Dandareau were members of the CIO. Coon testified that she was treated no differently by the petitioner after she joined. We can see no shred of justification for a finding that her lay-off was discriminatory. Dandareau testified that after she joined the CIO she was closely watched by forelady Keene for a whole day and that the rule against visiting was enforced against her more strictly than against the other girls. Accepting this testimony, there is still no ground for finding discrimination in her lay-off with numerous others because of lack of work in the finishing department. Moreover, the petitioner's effort to recall her to work in compliance with her seniority rights, if the testimony is believed, completely refutes the charge of discrimination. Failure to believe it can mean only that Keene and Beverly committed perjury and that the carbon copy of the letter of May 28th was a pure fabrication. We do not pass upon the credibility of the witnesses; Dandareau's testimony that she did not receive the letter and Beverly's testimony that he wrote it and followed the regular course to insure its mailing may both be true. The finding that Dandareau and Coon were laid off for the purpose of discouraging membership in the CIO must be reversed for lack of substantial evidence.

Florence Ippoliti, a looper at the Ballston Spa plant, was discharged on May 4, 1937, for violation of a company rule that "loopers must run their work in even dozens." She admitted her violation of the rule and that this was the reason stated for her discharge, but she complained that other girls were not discharged for similar violations. The Board found that the violation of the rule was widespread and the singling out of Ippoliti for discipline was discriminatory and based on her membership in the CIO. This inference is not justified. Forelady Keene testified that Ippoliti's work had always been poor, and this was corroborated by the testimony of four fellow employees who had occasion to see it. She was not active in the CIO, did not solicit members and had attended only one or two meetings. There is no testimony that forelady Keene or any one else connected with the peti-

tioner knew she was a member, although she testified that after she had joined the forelady watched her closely; but that the forelady's scrutiny was due to her labor affiliations is merely her conjecture. Other CIO members who likewise violated the rule in question were not disciplined. The inference that Ippoliti was discharged because of her CIO membership instead of her violation of the rule and her habitually poor work is too arbitrary to stand. To sustain it on such a record would grant to members of a complaining union absolute immunity from discharge for inefficiency.

Lastly, we come to the Board's finding with respect to the strike which was still in progress when the hearings were held in August 1937. It had started on June 12th, and its immediate cause was a fist fight at the Ballston Spa plant on the night of June 11th between an employee named Sweet who was a CIO member, and two or three other employees who were members of the Association. The fight was stopped by the foreman. During the night Sweet conferred with other workers and they decided not to go to work the next day. By June 22nd 223 employees were out but 32 of this number returned to work prior to the hearings. The Board considers the fight as the spark which set off the long smouldering conflict between the rival labor organizations. This may well be true, but is no justification for holding the petitioner responsible for the strike and requiring it to offer reinstatement to the strikers. No official representative of the CIO, nor any group of its members, had at any time presented any complaint to the petitioner or made any demand for action of any sort by it. No refusal by the petitioner to confer with its employees or any group of them was shown. Indeed, after the strike commenced the petitioner arranged a conference with representatives of the CIO, through Mr. Robillard, the local organizer. But when the representatives appeared on June 16th they refused to confer and withdrew from the meeting because of the presence of a stenographer to take minutes of what was said at the conference.

For the foregoing reasons we conclude that the Board's findings as to unfair labor practices by the petitioner are not supported by substantial evidence and that its order must be set aside. It is so ordered.