## MEDO PHOTO SUPPLY CORP. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 265. Argued March 2, 1944.—Decided April 10, 1944.

*Mr. William E. Friedman,* with whom *Mr. Walter N. Seligsberg* was on the brief, for petitioner.

*Miss Ruth Weyand,* with whom *Solicitor General Fahy* and *Messrs. Alvin J. Rockwell* and *David Findling* were on the brief, for respondent.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Petitioner recognized a labor union as the bargaining representative of its employees. At their request and upon their statement that they were dissatisfied with the union and would abandon it if their wages were increased, petitioner negotiated with them without the intervention of the union, granted the requested increases in wages and thereafter refused to recognize or bargain with the union. The only questions raised by the petition for certiorari are whether in the circumstances, petitioner's negotiations with its employees, its payment of increased wages, and its refusal to bargain with the union constituted unfair labor practices in violation of §§ 8 (1) and (5) of the National Labor Relations Act, 29 U. S. C. §§ 158 (1) and (5).

Upon complaint of the National Labor Relations Board charging petitioner with unfair labor practices, issued pur-

suant to § 10 of the Act, 29 U. S. C. § 160, the Board found that petitioner had violated §§ 8 (1) and (5) of the Act by interfering with its employees in the exercise of their rights to bargain collectively, guaranteed by § 7 of the Act, 29 U. S. C. § 157, and by refusing to bargain with a union representing its employees. The Board entered the usual order directing petitioner to cease the unfair labor practices so found, and requiring it to bargain with the union. 43 N. L. R. B. 989. On the Board's petition to enforce its order, the Court of Appeals for the Second Circuit overruled petitioner's contentions that the union, at the time of the alleged unfair labor practices, no longer represented petitioner's employees for purposes of collective bargaining and directed compliance with the order. 135 F. 2d 279. We granted certiorari, 320 U. S. 723, as the case involves questions of importance in the administration of the National Labor Relations Act.

The Board made findings supported by evidence that after eighteen of the twenty-six employees in petitioner's shipping and receiving department, constituting an appropriate bargaining unit, had designated the union as their bargaining agent, petitioner, on June 4th and 5th, 1941, recognized it as the exclusive bargaining representative of the employees. The union having proposed a contract providing for an increase of wages for the employees, petitioner agreed to meet the union representatives on June 9, 1941 in order to begin collective bargaining.

Two days before that date, twelve of the employees who were members of the union, waited on petitioner's manager and stated that they and the six other members had no desire to belong to the union if through their own efforts they could obtain wage increases, a list of which they submitted. The manager, at that time, declined to discuss the union, but stated that he would consider the request for wage increases with petitioner's president on the latter's return to the office on June 9th, and asked the employees to return on that day.

On June 9th, the manager, after a conference with the president, met with a committee of four of the employees who had conferred with him two days before. He advised them that petitioner would grant substantially the requested wage increases. The committee then withdrew to convey this message to the other employees, who thereupon agreed to accept the wage increases. The committee returned to inform the manager of this and that the employees "felt that they did not need the union, and we would rather stay out." Later in the day, the committee notified the union representative that the employees no longer desired the union to represent them. At a meeting on the same day with the representatives of the union, at which this committee was present, petitioner's attorney stated that he understood that the union no longer represented a majority of the employees and he declined to negotiate with it unless it were established by an election that it did.

From this, and from evidence which it is unnecessary to detail, the Board concluded, and we accept its findings, that the employees had not revoked their designation of the union as their bargaining agent before the wage increases were promised by petitioner's manager on June 9th; that the increases were induced by negotiations begun with petitioner on June 7th and concluded on June 9th before they had repudiated the union; that petitioner's determination to increase wages was "occasioned solely by the employees' offer to withdraw from the union if the raises were granted"; and that the employees' defection from the union was induced by petitioner's conduct in dealing directly with the employees.[1]

---

[1] It has now long been settled that findings of the Board, as with those of other administrative agencies, are conclusive upon reviewing courts when supported by evidence, that the weighing of conflicting evidence is for the Board and not for the courts, that the inferences from the evidence are to be drawn by the Board and not by the

In sustaining the Board's order the Court of Appeals assumed that as there had been no election or certification of the union as their bargaining representative, the employees were free to revoke their designation of it and to negotiate directly with the employer for an increase in wages, without the intervention of the union. But it thought that if such a proposal came from the employer, it would be a forbidden interference with the collective bargaining process and it concluded that, in view of the difficulties of determining whether in fact such an offer, ostensibly coming from the employees, was induced by the employer, the Board could conclude that the mere acceptance by the employer of the employees' offer was an unfair labor practice. A concurring judge thought that the case was stripped of any intimation of employer control but that the Board's order should be sustained on the ground that it was an unfair labor practice for the employer to bargain with the employees when their revocation of the union's authority was made conditional upon the majority's agreement to abandon collective bargaining altogether, even for an unspecified time.

We think it plain that the findings of the Board do not admit of either of these dispositions of the case. While the negotiations of petitioner with the employees resulted in a wage increase and their abandonment of the union, the negotiations were carried on by certain of the employees purporting to act in behalf of and to represent a majority. Nothing appears which would suggest, as the concurring judge thought, that any of the employees during or as

courts, save only as questions of law are raised and that upon such questions of law, the experienced judgment of the Board is entitled to great weight. See *Franks Bros. Co.* v. *Labor Board, post,* p. 702; *Labor Board* v. *Southern Bell Co.,* 319 U. S. 50, 60, and cases cited; *Labor Board* v. *Nevada Copper Co.,* 316 U. S. 105, 106–107, and cases cited; cf. *Dobson* v. *Commissioner,* 320 U. S. 489, 501, and cases cited.

a result of the negotiations had by agreement or otherwise foreclosed themselves from continuing such bargaining through the same or any other representatives whom they might choose. Nor in the circumstances disclosed by the evidence and the Board's findings can we say that it was of any significance whether, as the Court of Appeals thought, the employees' offer to abandon the union originated with them or was inspired by the employer. For in either case, as will presently appear, we think that the negotiations by petitioner for wage increases with any one other than the union, the designated representative of the employees, was an unfair labor practice. We think that the Board's order should have been enforced for the reasons stated by it.

The petition for certiorari does not challenge the Board's findings that the union represented a majority of the employees in petitioner's shipping department, and that they constituted a proper bargaining unit and that petitioner had agreed to bargain with the union. The evidence shows and the Board found that when the employees opened their negotiations with petitioner's manager on June 7th, they had not repudiated the union. On the contrary they made it plain that their proposal for its abandonment was contingent upon petitioner's willingness to give the desired wage increases. The evidence also shows, as the Board found, that the employees did not withdraw their designation of the union as their bargaining representative until after they had voted to accept the wage increases, and that until then, they had held themselves out as union members throughout their negotiations with petitioner and its representatives.

The National Labor Relations Act makes it the duty of the employer to bargain collectively with the chosen representatives of his employees. The obligation being exclusive, see § 9 (a) of the Act, 29 U. S. C. § 159 (a), it

exacts "the negative duty to treat with no other." *Labor Board* v. *Jones & Laughlin Corp.*, 301 U. S. 1, 44; and see *Virginian Ry. Co.* v. *System Federation*, 300 U. S. 515, 548–549. Petitioner, by ignoring the union as the employees' exclusive bargaining representative, by negotiating with its employees concerning wages at a time when wage negotiations with the union were pending, and by inducing its employees to abandon the union by promising them higher wages, violated § 8 (1) of the Act, which forbids interference with the right of employees to bargain collectively through representatives of their own choice.

That it is a violation of the essential principle of collective bargaining and an infringement of the Act for the employer to disregard the bargaining representative by negotiating with individual employees, whether a majority or a minority, with respect to wages, hours and working conditions was recognized by this Court in *J. I. Case Co.* v. *Labor Board*, 321 U. S. 332; cf. *Order of Railroad Telegraphers* v. *Railway Express Agency*, 321 U. S. 342; see also *National Licorice Co.* v. *Labor Board*, 309 U. S. 350, 359–361. The statute guarantees to all employees the right to bargain collectively through their chosen representatives. Bargaining carried on by the employer directly with the employees, whether a minority or majority, who have not revoked their designation of a bargaining agent, would be subversive of the mode of collective bargaining which the statute has ordained, as the Board, the expert body in this field, has found. Such conduct is therefore an interference with the rights guaranteed by § 7 and a violation of § 8 (1) of the Act.[2] There is no

---

[2] That the Act "carries the clear implication that employers shall not interfere" with the right of collective bargaining "by bargaining with individuals or minority groups in their own behalf, after representatives have been picked by the majority to represent all," was recognized by the reports of the Congressional committees recom-

necessity for us to determine the extent to which or the periods for which the employees, having designated a bargaining representative, may be foreclosed from revoking their designation, if at all, or the formalities, if any, necessary for such a revocation. Compare *Labor Board* v. *Century Oxford Mfg. Co.*, 140 F. 2d 541, C. C. A. 2d, decided February 15, 1944. But orderly collective bargaining requires that the employer be not permitted to go behind the designated representatives, in order to bargain with the employees themselves, prior to such a revocation. And it is the fact here, as found by the Board, that the employees did not revoke their designation of the union as their bargaining agent at any time while they were themselves negotiating with petitioner, and that they left the union, as they had promised petitioner to do, only when petitioner had agreed to give them increased wages.

Quite apart from the Board's finding of an unfair labor practice in petitioner's direct negotiations with its employees when they had not revoked their designation of the union, there can be no question but that it was likewise an unfair labor practice for petitioner, in response to the offer of its employees, to induce them by the grant of wage increases, to leave the union.[3]  *Labor Board* v.

---

mending the adoption of the bill which became the National Labor Relations Act. Sen. Rep. No. 573, 74th Cong., 1st Sess., p. 13; H. Rep. No. 1147, 74th Cong., 1st Sess., p. 20.

[3] We find no evidence in the record that petitioner's representatives stated to the employees either in terms or in substance, "We will give you the [wage] increases *and you can do as you please about the union.*" From the evidence, which fully supports the findings, it appears that the employees proposed to petitioner's manager on June 7th that they would leave the union if they were given wage raises; that the manager adjourned the meeting with the employees until June 9th in order to consider the suggested wage increases with petitioner's president. On that date, after considering the matter with

*Falk Corp.,* 308 U. S. 453, 460–461. This violation of § 8 (1) was in itself sufficient to support the Board's order to cease and desist. The words and purpose of §§ 7 and 8 (1) of the Act enjoin an employer from interfering with, or coercing, its employees in their rights to self-organization, to form, join, or assist labor organizations, and to bargain collectively through representatives of their own choosing. There could be no more obvious way of interfering with these rights of employees than by grants of wage increases upon the understanding that they would leave the union in return. The action of employees with respect to the choice of their bargaining agents may be induced by favors bestowed by the employer as well as by his threats or domination. *International Association of Machinists* v. *Labor Board,* 311 U. S. 72; *Labor Board* v. *Falk Corp., supra; Labor Board* v. *Pennsylvania Greyhound Lines,* 303 U. S. 261, 266–268.

Petitioner contends that it would be equally an unfair labor practice to refuse the wage increases as to grant them, for that would influence the employees to stay in the union, instead of abandoning it. But either consequence, as well as any violation of the Act, would in this case have been avoided if the employer, as is its statutory duty, had refused to negotiate with any one other than the duly designated bargaining representative of his employees. We are not now concerned with the question whether, in other circumstances, such action would have been an unfair labor practice. Nor does that possibility relieve peti-

the president, the manager announced to the employees that wage increases would be given, and this was immediately followed by the employees' desertion of the union. It also appears that it was petitioner's normal practice to grant wage increases only at the close of the year. From these facts the Board could conclude, as it did, that the purpose and the effect of the wage increases was to induce petitioner's employees to leave the union.

tioner of the consequences of its unfair labor practices which the Board has found.

Petitioner was not relieved from its obligations because the employees asked that they be disregarded. The statute was enacted in the public interest for the protection of the employees' right to collective bargaining and it may not be ignored by the employer, even though the employees consent, *Labor Board* v. *Newport News Co.*, 308 U. S. 241, 251, or the employees suggest the conduct found to be an unfair labor practice, *National Licorice Co.* v. *Labor Board, supra,* 353, at least where the employer is in a position to secure any advantage from these practices, *H. J. Heinz Co.* v. *Labor Board,* 311 U. S. 514, 519–521, and cases cited.

Petitioner cannot, as justification for its refusal to bargain with the union, set up the defection of union members which it had induced by unfair labor practices, even though the result was that the union no longer had the support of a majority. It cannot thus, by its own action, disestablish the union as the bargaining representative of the employees, previously designated as such of their own free will. *Labor Board* v. *Bradford Dyeing Assn.,* 310 U. S. 318, 339–340; *International Assn. of Machinists* v. *Labor Board, supra,* 82; cf. *National Licorice Co.* v. *Labor Board, supra,* 359. Petitioner's refusal to bargain under those circumstances was but an aggravation of its unfair labor practice in destroying the majority's support of the union, and was a violation of §§ 8 (1) and (5) of the Act.

The Board rightly determined that petitioner had engaged in the unfair labor practices which the Board found, and this determination supports its order directing the cessation of those practices. The petition for certiorari has raised no question as to the propriety of the Board's order directing petitioner to bargain with the union, which was also sustained and ordered enforced by the Court of Ap-

peals. We therefore have no occasion to consider that part of the order here. Compare *Franks Bros. Co.* v. *Labor Board, post,* p. 702.

*Affirmed.*

MR. JUSTICE ROBERTS dissents.

MR. JUSTICE RUTLEDGE, dissenting:

I dissent. The story told by this record is not of a dominating or intermeddling employer, interfering with employees in their collective bargaining arrangements or activities. It is rather of one which sought to do no more than meet its employees' wishes, freely formed and freely stated; and at the same time to be sure it would do nothing to violate the law governing their relations. The record is barren of any evidence of trouble or real dispute between Medo and its employees, of hostility by Medo to unions or employee organization, or of any refusal to bargain collectively as the statute requires.[1] On the contrary, it shows without contradiction that Medo regarded these things as wholly for the employees to settle among themselves; that it scrupulously sought to keep hands off; and that it was willing to bargain with them by whatever agency they might select. These attitudes were qualified only by the company's desire to be sure that the union was entitled legally to represent the employees and to avoid being caught in a possible jurisdictional dispute between the A. F. of L. and the C. I. O.[2]

The Board has found that Medo was guilty of unfair labor practice in three respects: (1) in dealing directly with the employees, rather than through the union, on June 7 and 9; (2) in refusing to deal with the union; (3) in granting the increased wages sought by the employees.

---

[1] There was no refusal to bargain with the union until June 9, 1941, after the employer and the employees had reached a full agreement. Cf. note 6 *infra.*

[2] Cf. note 5 *infra.*

On the facts, (1) and (2) come to the same thing, that before June 7 the union had acquired legal status as exclusive bargaining agent, which was effective to require Medo to deal only with it, and that this was not validly revoked then or later. The same things are subsumed by (3), which however poses the further question whether granting the increase in itself was an unlawful interference. The questions thus presented may be pictured more accurately in the light of further facts.

There is no evidence of labor trouble or employee dissatisfaction prior to May, 1941. On the contrary, for all that appears, relations were peaceful and harmonious. During that spring the A. F. of L.[3] put on a campaign to organize all photographic supply stores in New York. In May it got around to Medo. The company had about 70 employees. Of these, about 25 or 26 (including some supervisory employees) were in the shipping and receiving department, doing manual labor in the plant's basement. The others were clerical employees and salesmen, working upstairs. Stoltman, the A. F. of L. organizer, started out in May to organize all of Medo's employees in a single unit. Apparently he was not successful upstairs. But by May 23 he had signed up 18 of the downstairs men. He and they then decided to limit the unit to the basement, and requested the employer to negotiate. At the same time the union applied to the Board for certification. There was some short delay, owing to the absence of Medo's president over the Memorial Day holiday. But on June 4, at the Board's arrangement, the first conference concerning recognition was held.[4]

[3] Acting through the American Federation of Photo Employees Union, Local 21314, of which Stoltman, chief union figure in this case, was president.

[4] The Board's part in bringing about the conference was due solely to the union's having applied to it for certification simultaneously with the making of its first demand upon Medo to negotiate with it, not to any refusal by Medo to negotiate concerning recognition.

Several followed between that time and Saturday, June 7, when the employees intervened for themselves.

At all times Medo showed willingness to negotiate. But it also wished to be sure, as it had both the right and the duty to be, that the unit was appropriate and the union had a majority of the employees.[5] Medo further wanted to know something about the terms the union would demand, if recognized; not wishing, as it said, to "buy a pig in a poke." All of these things were matters of discussion between Stoltman and various company representatives in the conferences held on June 4 and 5. But it was not until the latter date that Stoltman finally submitted his substantive demands to Medo through Seligsberg, its attorney.

The Board's findings, in effect, are that on June 5 Seligsberg, in this conference with Stoltman, conceded finally all questions of representation, that is, of appropriateness of the unit and the union's majority status. Hence it concluded Medo then recognized the union as collective agent and, consequently, the only thing remaining for

---

[5] It felt, as Stoltman did at first, that there should be one unit in the small plant and was fearful of becoming involved in a jurisdictional dispute if the A. F. of L. should organize the unit downstairs and the C. I. O., which was actively organizing such units, should come in and organize the clerical and sales employees working upstairs.

The union clearly had a majority of the claimed unit from May 23 to June 7, since 18 of the 25 or 26 employees embraced in the unit had signed membership application cards and none had revoked his application or membership in that period.

The company, however, had to take Stoltman's word for this. It asked him for proof that his union represented a majority, but he declined to submit it, saying he would submit the cards only to a Board representative. The record does not show that Medo ever was given proof that the union had lined up its claimed and actual majority. This was one of the things which, in my opinion, the record shows was held for discussion and determination at the conference scheduled for June 9. Cf. text *infra* notes 6–10.

further discussion was the terms of the collective agreement. This finding is the basis for the Board's conclusion that Medo was guilty of unfair labor practices when it later dealt directly with the employees rather than through the union. Medo, however, says that all three questions remained open for final action by it at the conference scheduled for Monday, June 9, but not held because the employees intervened directly in their own behalf on Saturday, June 7.[6]

Seligsberg made particular statements in his conference with Stoltman on June 5 which, if disconnected from the context of the whole conversation and treated as in themselves stating the employer's entire position, could be taken as indicating intention to close the discussion on appropriateness of the unit and the union's majority status. These statements are the Board's only foundation for finding that Medo at any time conceded recognition to the union with finality. In my opinion it would do violence to the facts to regard them as sufficient to sustain these findings. The employer was entitled to a reasonable time for ascertaining the union's status before dealing

---

[6] It is undisputed that the employees, entirely of their own motion and without any stimulus or suggestion by Medo, on Saturday morning, June 7, sought a conference with Medo's officials, without disclosing their purpose. The request was granted and the conference held Saturday afternoon. As it opened, one of the men mentioned the "union situation." But Medo's general manager, Hoppin, at once and flatly declined to discuss that, saying he would discuss anything else. The men then stated their desire for an increase in wages, and not to have the union. They specified the wages sought and Medo's reply, granting them in part, was given the following Monday morning, June 9. On Monday afternoon there was also a conference with Stoltman, but because of the turn events had taken by the employees' intervention it served only as the occasion for notifying him that Medo and the employees had reached agreement and therefore the company would not deal further with the union.

with it [7] and this had not expired on June 7 or, for that matter, on June 9.[8] Prior to June 5 all questions were open. The conference then was not begun, carried through or concluded with any intention or purpose that understandings which might be reached were or could be taken to be final. Medo's representative was doing a lawyer's job,[9] which was to see how far he and Stoltman could agree on terms to be considered by his client as a basis for final decision. They had been successful previously in bringing other employers and employees together in more difficult disputes and the whole intent of their conference was to find a basis of possible agreement upon all matters, including representation,[10] for consider-

---

[7] Cf., e. g., *North Electric Mfg. Co.* v. *Labor Board*, 123 F. 2d 887 (C. C. A.); *Texarkana Bus Co.* v. *Labor Board*, 119 F. 2d 480, 484 (C. C. A.). See also *Labor Board* v. *Union Pacific Stages*, 99 F. 2d 153, 158–159 (C. C. A.).

[8] It is to be recalled that the whole period from demand by the union on Medo to negotiate to the time the employees intervened extended only from May 23 to June 7, and that the period of active negotiation began on June 4. Three days, or even a little more than two weeks, is hardly too much under the circumstances here present to allow an employer for determining whether the union meets the statute's requirements.

[9] Seligsberg's testimony was: "That was the purpose of the postponement. They were to bring us proof of representation. We were both to study the question of unit, and we were to study it—and when I say 'we,' I mean the employer, because *except as to language*, I wouldn't know anything about it. They were to study it. Mr. Hoppin and Mr. Goodfield and Mr. Niemeyer, if he were there—which I don't remember—were to study the proposed terms and see how they compared with the possibilities." (Emphasis added.) Seligsberg consistently testified that he and Stoltman considered "all three questions together, proof of majority, proof of unit, and the contract." He was a director and secretary of the company, but not a shareholder.

[10] In the conference Seligsberg renewed a previous request for proof that the union had a majority and conditioned the discussion upon the company's being satisfied in this respect and that the unit was appropriate. Cf. note 9 *supra*. However, Stoltman again refused to exhibit the cards and renewed his offer only to submit them to a Board rep-

ation by Medo for its final decision and with a view to further discussion and possible final settlement in the conference agreed upon for June 9. To tear Seligsberg's statements out of this setting and context and make of such tentative understandings or bases of further negotiation final concessions of recognition is to draw inferences wholly unwarranted by the record. It is therefore not at all clear that on June 7 negotiations had passed beyond the stage of recognition or, consequently, that the union then was legally entitled to act as exclusive bargaining agent.

But even assuming that Medo on June 5, through Seligsberg, conceded recognition, still I cannot agree that it committed any unfair labor practice, under the facts shown here, either in merely hearing what the employees had to say or, after declining to be drawn into discussion of their relations with the union,[11] in granting unconditionally their freely made and wholly uncoerced request for an increase in wages. In my view it is immaterial that this, in effect, short-circuited the union, for two reasons. One is that, under the special circumstances, the employees had the right to revoke the designation and did so by undertaking to deal for themselves; the other, which is perhaps but a different way of stating the first, is that the union itself had no right or interest sufficient to prevent them from doing so.

At most the employer did nothing more than accede to the wishes of a clear majority, both in listening to their request and in granting it. There is no claim or semblance of proof that Medo induced the men to make the

---

·resentative for comparison with Medo's payroll. The record does not show this was ever done, although in my opinion, contrary to the Board's findings, it does show conclusively that the parties contemplated it would be done and that the result of the comparison would be given to Medo before the negotiations should be concluded with finality of recognition.

[11] Cf. note 6 *supra*.

request. On the contrary, it is not disputed that, when they asked for the conference on June 7, the request came unexpectedly to Medo. And when, at the start of the conference the men mentioned the union situation, Medo's general manager, Hoppin, stated at once and flatly that he would not discuss their union affairs or relations with them, clearly implying that this was their business exclusively, not the company's.[12] Asked whether he would discuss other matters, he answered affirmatively. The men thereupon said they wanted the increase and there is some evidence they also said unconditionally that they did not want the union.[13] The Board, however, has found that they coupled the two statements conditionally, namely, that they did not want the union, if they could have the increase without it.

The Board concluded that Medo's action on June 9 in granting the increases, though less than what were requested, "constituted interference with the self-organizational rights of its employees," on the theory that this influenced them to abandon the union. It also held that the employees' action in approaching the company on June 7 did not "constitute an implied revocation of their designation of the Union so as to relieve the respondent of the obligation to deal solely with it," and therefore dealing directly with them was a violation of Medo's

---

[12] Cf. note 6 *supra*. Hoppin's testimony was in response to the question "What happened after they came to your office?" (on Saturday afternoon): "They came up and said that, 'We have decided that we don't want to have anything to do with the union.' I immediately stopped them, and I told them that if there was anything at all pertaining to any union activities, I did not want to listen to them at all, but if it was anything else they had to offer, I would be willing to listen to them."

[13] Hoppin testified he was told: "We have one thing that we are primarily interested in. The working conditions here are excellent. We are very happy with our jobs, but we would like to get more money."

statutory duty to the union and an unfair labor practice. The Board's theory was, apparently, that the men, to revoke their designation, were required to communicate the revocation to the union and that the union had acquired such an interest or status no other act could terminate the agency, however inconsistent with its continued existence and exclusive character.

The statute makes no provision that the agency, once created, shall continue for any specific time. It prescribes no particular method for terminating, as it makes none for creating,[14] the agency. Greater formality hardly would seem to be required in the one case than in the other. The statute purports to be drawn in favor of protecting the interests of employees, not those of unions as such.[15] True, while the agency exists it is exclusive for its appropriate purposes. But it is so only while it does exist and the question here is whether it continued in force after the employees took matters into their own hands and showed to the employer by that act that they wanted to deal for themselves, not through the union.

The Board implies and the Court says the employer should have declined to discuss with them any matter which was appropriate for collective bargaining, since the union was their agent for this purpose. Therefore, it is concluded, the employer violated their rights under the statute to bargain collectively. This, although it is conceded the twelve employees spoke for 18 of the 25 or 26

---

[14] Cf. *Lebanon Steel Foundry* v. *Labor Board*, 130 F. 2d 404 (App. D. C.).

[15] Whatever justiciable "interest" the union may have in continuing to act as the employees' representative, its status as such is for the principal's benefit, not its own, and is terminable at the former's will. Cf. *Consolidated Edison Co.* v. *Labor Board*, 305 U. S. 197, 237; *Labor Board* v. *Sands Mfg. Co.*, 306 U. S. 332, 344; *Labor Board* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240, 261–262; *Labor Board* v. *Remington Rand*, 94 F. 2d 862, 869–870 (C. C. A.); *Labor Board* v. *Lion Shoe Co.*, 97 F. 2d 448.

in the unit and it does not appear that what they did was disapproved or repudiated by the other six or seven. Merely to state this proposition should be enough to negate it. For it preserves rights of employees to bargain by representatives of their own choosing by destroying them. In all normal agency relations, except those "coupled with an interest," [16] the principal can revoke them by exercising the agency himself.[17] He need not notify the agent. When he acts on his own behalf, he exhausts the subject matter of the agency and it comes to an end.

Unless a designated union acquires, by its selection, a thraldom over the men who designate it analogous to the power acquired by one who has a "power coupled with an interest," unbreakable and irrevocable by him who gave it, it would seem that any powers the union may acquire by virtue of the designation would end whenever those who confer them and on whose behalf they are to be exercised take them back of their own accord into their own hands and exercise them for themselves. And this should be true, whether or not previous notice is given to the union and whether or not the subject matter of the resumption may include, as one consequence of the dealing, the possible continuance of the agency. For it is the very taking back of the right to deal with their employer, not what he does in response to this, unless that creates some new pressure or influence not contemplated in the employees' freely made proposals, that shows the intent to destroy the agency. Dealing for themselves and dealing exclusively through the agent cannot coexist. The

---

[16] See, e. g., *Hunt* v. *Rousmanier's Administrators*, 8 Wheat. 174; *Lane Mortgage Co.* v. *Crenshaw*, 93 Cal. App. 411, 269 P. 672; *Hall* v. *Bliss*, 118 Mass. 554; Note (1930) 39 Yale L. J. 110.

[17] See, e. g., *Ahern* v. *Baker*, 34 Minn. 98, 24 N. W. 341; *Mott* v. *Ferguson*, 92 Minn. 201, 99 N. W. 804; *White & Hoskins* v. *Benton*, 121 Iowa 354, 96 N. W. 876; *Gilbert* v. *Holmes*, 64 Ill. 548.

one wholly excludes the other and the real question becomes, which is to prevail, the agent's interest and right or the principal's, the union's or the employees'?

I do not think Congress intended, by this legislation, to create rights in unions overriding those of the employees they represent.[18] Nor did it require a special form or mode for ending a collective agency any more than for creating it. What Congress did was to give the designated union the exclusive right to bargain collectively as long as, and only as long as, a majority of the employees of the unit consent to its doing so. When that majority vanishes by the employees' voluntary action, whatever form this may take, and the fact is made unmistakably clear to the employer, it not only is no longer under duty to deal with the union; it comes under affirmative obligation not to do so. For otherwise it would be dealing with a representative not of the employees' choice.

There are two possibly applicable limitations. One is that the employer must not interfere to bring about the abandonment. The other is that, in large units, where there are difficult problems of ascertaining whether a majority exists at a particular time, a reasonable degree of stability in employment relations may require, to give the statute workable operation, that a majority designation be deemed to continue for a reasonable period, though changes meanwhile may take away the clearly existing majority, a question not yet finally determined.[19]

The latter limitation, if it is one, can have no reasonable application to a small unit and a small employer under circumstances like those involved here. In such a situation to impose it, where the actual desires of the majority may be easily and readily ascertained at any time, would

---

[18] Cf. note 15 *supra.*

[19] Cf. *Labor Board* v. *Century Oxford Mfg. Corp.,* 140 F. 2d 541 (C. C. A.).

698

be to force men into unions and into dealing with their employers through unions contrary to the employees' own wishes. The statute has no such purpose.

But it is said the other limitation applies here, that the employer shall offer no inducement and exert no influence to secure abandonment. This, too, is a salutary principle when properly applied. And it may be applied as well to a small unit and a small employer as to large ones. But again the limitation is not universally applicable. Whether it is applicable or not depends upon what the employer does. Clearly if he stimulates a proposal from the employees to abandon the union for any substantial advantage he may give, the limitation should be effective. But does he do this when, with no suggestion or intimation on his part, when rather he has shown every willingness to leave the whole matter of their organization to his employees and to deal with them in any way they wish, they come to him, without influence, without coercion, and make a proposal wholly of their own conception and desire?

It is not impossible for men to want wage increases and also to remain or become nonunion men at the same time. Nor is such a combination of desires illegal. When such a proposal is thus made, and the employer does no more than was done here, namely, accede to it, knowing he is dealing with a majority of the unit, saying in effect, "Whether or not you have a union is your own business, not mine. But whether you do or not, you get the increase you want," then in my judgment two things have happened: (1) The employees have revoked the collective agency, as they have a right to do; and (2) the employer has been guilty of no unfair labor practice either in hearing their proposal or in acceding to it. He has done no more than comply with the wishes of the majority, freely formed and freely stated. And this it is the employer's duty to do under the statute. If thereby the union has

been by-passed, it is not through the employer's action, but rather through that of the employees. The employer's response, so limited, is not a violation of the principle, recently stated here,[20] that individual employees cannot deal with the employer to create terms in the contract of employment inconsistent with the collective agreement. Such a situation presents no case of inconsistent individual bargaining. It involves rather one of collective bargaining, not by individuals as such, but by the majority on behalf of the unit.

Finally, if more is needed, the matter should be considered in the light of Medo's predicament when the employees made the proposal, account being taken of the alternative courses open to it. Under the Court's ruling it was between the devil and the deep blue sea. There was no answer Medo could give which would not leave it open to a charge and a finding of unfair labor practice. The employees wanted an increase, according to the findings, with the union if they could not get one without it; without the union, if they could. The main thing in their minds was the increase, not the union.[21] In effect, according to the findings, they said so to their employer. It had to keep silent or reply. It could reply in several ways: (1) The union is your exclusive agent and we cannot deal with you while it is such; (2) we will give you the increase if you discharge the union; do that and then come back; (3) we will give you the increase and you can do as you please about the union; (4) we will not give the raise, union or no union.

The Court says the company's reply should have been (1), whereas its response actually was (3).[22] It finds the

---

[20] *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332; *Order of Railroad Telegraphers* v. *Railway Express Agency,* 321 U. S. 342.

[21] Cf. note 13 *supra.*

[22] That this is the fair meaning of Medo's response is clear from its refusal to discuss or interfere in the employees' union activities, cf. note 12 *supra.*

latter bad because in effect it offered "inducement" to the employees to abandon the union. The trouble is that the same thing would have been true of (1) or of any of the other possible replies. Answers (2) and (4) clearly would constitute unfair labor practices, under the Court's view, the former as offering inducement to abandon, the latter as a flat refusal to bargain through the union or otherwise. Answer (1), while purporting to say only that the employer could not deal with anyone as long as the union retained its exclusive agency, in fact would be infected with two faults. One would be the assumption that the employees could not revoke the agency and take matters back into their own hands, without giving prior notice to the union, a question involved in the issues here. But, even more plainly, by making this response the employer would open itself to the charge and to the finding that it had said, in effect: "We cannot deal with you directly while the union's agency stands unrevoked," and thereby had offered, by clear implication, the inducement of dealing with the employees directly, conditioned upon their discharging the union.

The only other answers open to the employer were (3), the one Medo actually made, and to remain silent. Merely ignoring the employees might have been taken to mean anything, but more probably answer (4) than any other. Silence therefore afforded no escape from the trap. Nor does the Act require silence in such a situation. Consequently answer (3), which Medo gave, was the only one it could give consistently with the view that the employer should hold out no inducement to the employees to abandon the union. In effect it said simply, "We are perfectly willing you should have the increase. But whether you have it through the union or without it is entirely your own business and we will not have anything to do with this." Any other reply would have

been a counter-proposal offering inducement to abandon or a rejection of all bargaining. The answer Medo gave was neither. It was merely accession to the employees' wishes, not "inducement" or offer held out; and it was coupled with the clear indication, under the circumstances, that what the employees might do about the union was wholly their own affair and none of Medo's.

Accordingly, I think Medo gave the only possible answer consistent with the statute's requirements and purposes and the only one which afforded no substantial basis for finding either that it was refusing to bargain collectively or that it was interfering with the employees' rights of organization by offering inducement to get rid of the union. In my opinion the Wagner Act was not designed or intended to put an employer, whose sole purpose and conduct are to give his employees completely free rein in matters of organization and collective bargaining, on such a spot that anything he may do will be, or will form the basis for a finding that it is, an unfair labor practice. So to construe the Act not only would make it a trap for employers, but also would defeat the very purposes the statute was intended to accomplish, by fastening upon employers and employees alike union domination the latter do not want. This would be to destroy, not to safeguard, the employees' basic right of collective bargaining by representatives of their own choosing. I would reverse the judgment with instructions to dismiss the petition for enforcement.