NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MODERN PLATING CORPORATION, Respondent.

No. 15327.

United States Court of Appeals Seventh Circuit.

March 22, 1966.

Swygert, Circuit Judge, dissented.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul M. Thompson, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N. L. R. B., Washington, D. C., for petitioner.

William B. Powell, Reno, Zahm, Folgate & Skolrood, Rockford, Ill., for respondent.

Before DUFFY, SWYGERT and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here on petition of the National Labor Relations Board, pursuant to Sec. 10(e) of the National Labor Relations Act, as amended (Title 29 U.S. C.A. § 151 et seq.), for enforcement of its order issued against respondent on January 19, 1965. The Board's decision and order are reported at 150 N.L.R.B. No. 115.

The alleged unfair labor practices occurred at Freeport, Illinois, where respondent is engaged in electroplating metals. No jurisdictional issue is presented.

The Board found, in agreement with the Trial Examiner, that the company violated Sec. 8(a) (1) of the Act by offering to grant a wage increase to employees to discourage their membership in the Union, by granting a wage increase to the employees for that purpose and by advising employees that they would lose rather than benefit from union representation.

Respondent resists enforcement of the order on the basis that there is no substantial evidence, when the record is considered as a whole, in support of the Board's findings. With this contention we agree.

The incidents giving rise to the controversy took place around March 1, 1963. At that time respondent had 120 employees. There was no evidence of hostility on the part of respondent toward a union, and nothing to indicate other than an harmonious relationship between it and its employees.

In the last part of February 1963, a business representative of the Union (Lodge 1096, International Association of Mechanics, AFL-CIO) met with some of respondent's employees, some fifteen or twenty of whom signed application cards and some began to wear union buttons in the plant.

On March 9, a group of employees consulted their supervisor about a wage increase. They were advised to send a delegation to the president's office rather than to go en masse, and a group consisting of Frank Truman, Charles Eichmeier, Charles Nicklaus, James Thruman, Robert Parker and Calvin Thompson went to the office of Richard Servatius, respondent's president. The Board in its brief relates what purportedly took place at that time:

"Charles Nicklaus, acting as spokesman, asked Servatius whether it was true that his office was always open and that the men were free to come in and discuss matters with him. Servatius agreed that it was and Nicklaus said that the men had come in to ask for 'a dime' raise. Servatius then asked whether the men were speaking just for themselves or whether they were asking 'for a union raise,' that is, for the whole plant. Nicklaus said he referred to the whole plant.

"Servatius answered that he could not afford it because he 'had bills' and was trying to get a new plant which would mean a lot of new bills coming up, but he pointed out that the men had 'the best insurance in Freeport.' The men stated that they, too, had bills, and Thompson remarked that it was necessary for him to hold two jobs to make ends meet. Thompson was wearing a Union button and Servatius asked him what it was and whether he was in the Union: Thompson said he was not. There was some further general talk and Servatius then asked, if a raise were considered, 'would this union crap be dropped?' Apparently, none of the employees answered this question, but Servatius then said that he would think it over and that the men could come back in 2 or 3 days and they would discuss it further."

This appraisement of what was said at the March 9 meeting is far more favorable to the Board than the record justifies, particularly that portion relied upon in support of its finding that the wage increases were promised and granted to discourage membership in the Union. Of the six employees who were present at the meeting, only three, James Thruman, Charles Nicklaus and Calvin Thompson, were witnesses. They all agreed that the

purpose of the meeting was to make a request for an increase in wages. Only Thruman testified as to the "union crap" statement. His testimony on this point was not corroborated by any other witness. On cross-examination he admitted that he heard nothing which connected the requested pay raise with the Union, as shown by the following:

"Q. During that conversation to which you have testified did you or anyone present make any reference to what wage rates would be in effect if the union got in?

"A. Not that conversation, I don't know. I didn't 'no.

"Q. And you heard nothing or no one mention any wage rate that would be in effect if the union got in?

"A. If the union got in—no, I don't recall that."

Nicklaus who was spokesman for the group was not even certain that the word "union" was mentioned. He testified:

"Q. Did he [referring to Servatius] say anything about the union with the raise?

"A. Well, we talked a little bit more about this raise part and he said that if he considered the raise would we consider—I wouldn't quote, 'union', but would we consider dropping this mess, yes, would we consider dropping this mess that was going around there. I don't know, he might have said union but I won't swear to it."

Thompson knew nothing about the "this union crap" statement; in fact, all that he remembered was that Servatius "looked at me and he asked if we was in the union, those who was wearing union buttons, and we said, no."

Servatius admitted that after they asked for a raise he made inquiry as to the union buttons they were wearing and that:

" * * * they requested a dime raise and they stated that this union talk would probably be stopped if they were granted this increase and I told them that we had been planning to give an increase of five cents an hour

to anyone that hadn't had a raise in the last 10 months."

He further testified, without contradiction, that he told them that the company could not grant a 10¢ across-the-board increase but that he would give the request consideration and let them know in a day or two. He also stated that the company for three or four months had been considering a wage increase. On cross-examination he was asked:

"Q. * * * Do you recall saying to them, 'Will all of this garbage talk be dropped'?

"A. After Nicklaus made that statement that the union talk would be stopped, I said, 'You mean that union garbage will stop', and he said, 'Yes.' "

A day or two following the March 9 interview, Servatius stopped at Nicklaus' work station and told him that there would be a 5¢ increase for all who had not had a raise within the preceding ten months. Two weeks later, fifty-two employees were given a 5¢ raise, one a 10¢, and sixty-seven received no raise.

The record is silent as to the names of the fifty-three employees who received a wage increase. It is not even shown whether the six employees who attended the March 9 meeting received increases. There is no proof, not even a suggestion, that the wage increases were allowed on a discriminatory basis. All of the few employees who had signed union cards might have been included or all might have been excluded. Nothing is shown for certain other than that the increases were allowed in response to the request of the employees at the March 9 meeting and in conformity with a plan which respondent already had under consideration.

Even though we indulge in the dubious assumption that the Board's findings as they relate to the March 9 meeting carry substantial support, it is not discernible how a reasonable inference can be drawn that wage increases were offered or allowed for the purpose of discouraging membership in the Union. Which could have been discouraged—the group to

which increases were allowed or the larger group to which they were denied? It can hardly be the former because the increases were allowed by respondent at their request. If the increases had any effect on the latter group, it would have been an encouragement rather than a discouragement of their Union activities.

The Board cites three cases in support of its conclusion that the wage increases were allowed to persuade the employees to reject a union: N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435; Indiana Metal Products Corp. v. N. L. R. B., 202 F.2d 613, 620 (C.A.—7), and N. L. R. B., v. Douglas and Lomason Co., 333 F.2d 510, 513–514 (C.A.—8). None of these cases, with their widely different factual situations, is of any benefit to the Board here. For instance, in the *Exchange Parts Company* case the employees had not requested a meeting with their employer. There, the employer of its own volition, absent a request by its employees, took the initiative and announced increased benefits two weeks before a scheduled election.

The Board attempts to bolster its case with testimony concerning two widely separated and isolated statements made by supervisory employees and found to have been coercive. Employee Shenberger testified that Supervisor Stearns inquired of him, "How many guys had signed up for the union?" and that he replied, "A couple of them." Further, "I believe, he said—he told us about the union that was in there before and he said that we would be further from—or that we would be better off if we tear up the cards and forget about the union."

On April 1, several of respondent's employees and ex-employees held a party at the V.F.W. clubhouse in Rockford as an expression of regard for a fellow employee who had retired after about twenty-five years of service. Among those present were Alvin Leroy Loring, an invited guest, one of respondent's foremen, and Ronald LeBaron, who had not been an employee of respondent for more than two years. LeBaron testified that sometime during the social affair, far removed from respondent's premises, he had a conversation with Loring in which the latter asked "if I was getting anything out of this organizing. I said no, just helping them and my local is all." He testified that Loring stated, "I don't know how the fellows can do any better or how the union can do these fellows any good. They are making as much money as anybody in town does right now with all of this overtime; if they get the union in they will probably only get a ten cent raise and that will go for union dues anyhow," and "He mentioned that if the union got in that all of the overtime would be closed off because they would employ a third shift." On cross-examination, LeBaron testified:

"Q. Was there any statement made in that conversation, so far as you know, with respect to a rate of wages which would be in effect if the union got in?

"A. No, there was a discussion, but it was over the wages in Milwaukee. There was no discussion of wages here."

In our judgment, the statements by Stearns and Loring, considered in connection with the surrounding circumstances, were no more than an expression of their views or opinions, permissible under Sec. 8(c) of the Act.

The Board's petition for enforcement of its order is denied.

SWYGERT, Circuit Judge (dissenting).

I reluctantly dissent.

The trial examiner's decision reads in part:

Based upon the testimony of Frank Thruman, Charles Nicklaus and Richard Servatius, and upon their demeanor while testifying, I find that the exchange occurred as the employees testified and that Servatius offered to consider granting a wage increase if the men would cease their Union activities.

Since we are ordinarily bound by the credibility resolutions of the examiner, I am of the view that there is substan-

tial evidence in the record as a whole to support the Board's finding that the respondent violated section 8(a) (1) of the National Labor Relations Act. In my opinion, this case falls squarely within the purview of N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), and Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).