**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STURGEON ELECTRIC CO., Inc., Respondent.**

**No. 10108.**

United States Court of Appeals
Tenth Circuit.

Dec. 4, 1969.

**52**

Nan C. Bases (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and William Wachter, on the brief) for petitioner.

Howard E. Erickson, Denver, Colo. (Wayne D. Williams and Williams, Erickson & Wallace, Denver, Colo., on the brief) for respondent.

Before HILL and HOLLOWAY, Circuit Judges, and BRATTON, District Judge.

HOLLOWAY, Circuit Judge.

Petitioner National Labor Relations Board found that unfair labor practices in violation of §§ 8(a) (1), 8(a) (2) and 8(a) (5) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., were being committed by respondent Sturgeon Electric Company and ordered the company to cease and desist. Here the Board petitions for enforcement of its order. Due to concessions by respondent the issues now principally concern the correctness of the § 8(a) (5) finding and order for respondent to bargain collectively, and whether remand to the Board is necessary.

The case involves, among other things, the establishment of majority status by a union through authorization cards. Since argument here, National Labor Relations Board v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), has disposed of respondent's general claim of unreliability of such cards. After the decision in *Gissel* the Board suggested that if the findings of violations are upheld in line with its argument, it may be proper to remand the case for the Board to consider its remedial bargaining order under *Gissel,* or in the alternative that the case be remanded without such review of the findings. Respondent, although foreclosed on some contentions about authorization cards by *Gissel,* still maintains that the findings and bargaining order under § 8 (a) (5) are incorrect and that enforcement should be denied by the Court and no remand made. The company does not now contest the findings of violations of §§ 8(a) (1) and (2) (unlawful interference, restraint and coercion of employees, and unlawful support of a labor organization), nor the finding that foreman Hambley, whose actions are discussed below, was a supervisor within the meaning of the Act so that his conduct was chargeable to the company. We conclude that we should now review the § 8(a) (5) refusal to bargain finding, which remains in controversy.

The issues before us arose in connection with an organizational drive by the International Association of Machinists and Aerospace Workers, District Lodge 86, AFL-CIO (hereafter IAM) among respondent's garage employees. The basic charge is that the company favored the International Brotherhood of Electrical Workers, Local 111, AFL-CIO (hereafter IBEW) and unlawfully supported IBEW and refused to bargain with IAM. The company engages in the business of electrical construction and service in the vicinity of Denver, Colorado. It has three operating divisions: (1) line construction, including over-

head and underground transmission lines; (2) service, involving small residential and commercial work; and (3) inside construction work on larger residential and commercial projects. The service and inside construction workers have been represented for some years by a sister local of IBEW. For many years the company has been a member of an association having contracts with four labor organizations, including IBEW Local 111 and three sister locals, which contracts cover the employees of respondent's line division. Company officers consider the garage an adjunct of the line division. However, there was a disagreement among the contractors about inclusion of the company's garage employees in the unit and so they were not covered by the contracts. In the findings involved here the Board determined that a unit of the company's garage employees was appropriate for bargaining.

We will refer to various facts which the proof tended to show. The company's seven garage employees were found by the Examiner to be an unorganized residual or fringe group. There was proof for respondent that early in 1966 the business agent of IBEW, Mr. Duffey, had told the company vice president, Mr. Baumgartner, that he was going to organize the garage employees and that during the summer Duffey said he wanted to talk about a contract. Baumgartner testified that in mid-August he believed Duffey represented a majority of the garage employees, but he did not know how many. Baumgartner said he thought that he recognized IBEW when he was told that Duffey was going to "work on" the garage employees and replied: "Have at it." The Board found that recognition of IBEW was not made by the company's acts in August.

In August the IAM organizational drive in question occurred. On request by a garage employee, IAM representatives visited the garage on August 22 and talked with the employees and distributed cards and applications. The garage foreman, Mr. Hambley, telephoned the IBEW business agent Duffey that day or the next and said the men wanted to talk to him about joining the union. However, five full-time employees of the garage signed the IAM authorization cards and membership applications on August 23 and 25.[1] On August 26 Duffey visited the garage and talked to the employees on behalf of IBEW and left some cards with Hambley, but there was no proof of any cards being signed for IBEW at that time.

On September 13 IAM picked up its five signed authorization cards and the next day wrote the company president, requesting recognition and offering to prove its majority status. The letter was received on September 15 by the company and turned over to Baumgartner. Baumgartner testified that the management had not known earlier about the IAM contacts with the garage employees. Apparently no reply was made to IAM for several days.

On September 16 Duffey asked Baumgartner for a meeting about a contract. During the conversation Baumgartner suggested that foreman Hambley and another garage employee be present. The two were the only full-time garage employees belonging to IBEW and they took part in the contract discussions that day. Foreman Hambley did so as an employee. At about this time and somewhat earlier Hambley also urged some of the garage employees to sign cards for IBEW which were kept at his desk. Baumgartner and Duffey agreed orally on a contract on September 16, subject to approval by the company president. Later the contract was drawn up by Duffey and signed on September 30 by the parties, the agreement incorporating a

1. The cards authorized IAM to represent the signer in order to negotiate and conclude agreements covering hours, wages and other employment conditions, and superseded any previous similar authorization given. The cards made no reference to any use of them in connection with elections. There is no claim that the signers were told that the cards were to be used to seek an election.

union-security clause of the master contract between the contractors' association and IBEW.

In the meantime, on September 20 the company president replied to IAM's demand of September 14 for recognition. He said the company was anxious to handle the situation with the garage personnel properly and with dispatch but that the company attorney was out of town until October 5 and requested postponement of any action until his return. No reference was made to the negotiations with IBEW which were under way. On September 19 IAM filed a petition for a representation election with the Board. On September 22 the company president advised IAM that the company had signed a working agreement with IBEW on September 16 covering the garage personnel.

From the proof concerning these events the Examiner and the Board made the findings of §§ 8(a) (1) and 8(a) (2) violations by the company which are not now resisted. However the Examiner recommended dismissal of the § 8(a) (5) refusal to bargain allegation. The Board found nevertheless that the company's conduct proved refusal in bad faith to recognize IAM in order to destroy its majority status and to substitute IBEW as the bargaining representative. Accordingly it found a violation of § 8(a) (5) and included a provision for bargaining with IAM in its cease and desist order. We turn now to respondent's arguments for setting aside that finding and for denying enforcement.

First respondent argues that there was no substantial evidence of an IAM majority among the garage employees on or after September 15. We are concerned with the seven garage employees.[2] Five cards were signed for IAM on August 23 and 25. The company argues that the effect of two cards was nullified by the signing of another card for IBEW by employees Johnson and Tuttle.[3] However, the Examiner found that Hambley's conversation with Tuttle to get an IBEW card signed by him probably took place on September 16, but not earlier. Since his IAM card would not have been affected on September 15, the date of the IAM demand, an IAM majority then remained. Also the company says the IAM cards became stale because they were withheld while the garage employees urged Duffey to bargain for them; that later delivery of the cards to IAM was the act of only one employee; and that all the circumstances show equivocal behavior destroying the effect of IAM's cards. However, there was contrary proof also of some resistance through September 15 to efforts to get IBEW cards signed. As against the unambiguous IAM cards there was no proof of any effort to withhold them and no clear repudiation of IAM was shown by the various statements proved.

In any event after weighing all the proof the Examiner found that on August 23 and at all material times thereafter IAM was the representative of the garage employees, and the Board adopted the finding. On examination of the entire record we conclude that the

2. The Board found that the garage employees made up an appropriate bargaining unit. On the basis of the situs of their work and the showing of the time spent there, the finding represents a proper exercise of informed discretion on the composition of the unit and thus the finding may not be disturbed. Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947) ; Mountain States Telephone & Telegraph Co. v. National Labor Relations Board, 310 F.2d 478 (10th Cir. 1962).

3. The company also points to the fact that Pendergraft and Winckle were, as required by the master contract in their earlier employment, IBEW members. Nevertheless on the basis of the whole record and the August 23 and 25 signings of unequivocal IAM cards by five employees, we accept the Board finding of IAM majority status on the critical date of September 15 and earlier.

finding is supported by substantial evidence and must be accepted by us. See Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); National Labor Relations Board v. Wylie Manufacturing Co., 417 F.2d 192 (10th Cir. 1969). Moreover, on findings which we likewise accept as supported by substantial evidence, it was determined that the IBEW cards signed by Tuttle and Pazen were unlawfully obtained as a result of unfair labor practices so that respondent may not rely on the IBEW cards to discredit the IAM majority. See Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). Respondent recognizes that its general claim of unreliability of cards was disposed of by *Gissel.* Thus, the unambiguous IAM cards formed a proper basis for the Board finding of an IAM majority. National Labor Relations Board v. Gissel Packing Co., Inc., supra, 395 U.S. at 597–598, 89 S.Ct. 1918, 23 L.Ed.2d 547.

Secondly the company argues that its refusal to bargain with IAM was justified by prior valid recognition of IBEW and bargaining for a contract. Respondent says there was no reasonable doubt of an IBEW majority about August 26 and that valid recognition was then given to IBEW. We have dealt above with the finding that instead majority representation by IAM was effective at all material times after August 23, a finding supported by substantial evidence. As to company recognition of IBEW in August, Baumgartner said that the nearest thing to formal recognition was his statement to "Have at it" when Duffey told him about the middle of August that he was going to "work on" the garage employees. All the proof relied on as showing recognition of IBEW in August was similarly vague. The Examiner and the Board found that the company never recognized IBEW prior to September 15 (the date the IAM demand was received) but made such recognition on September 16 when the contract negotiations with IBEW occurred. The finding is supported by substantial evidence.

■ The company argues that its recognition of IBEW and bargaining with it were permitted by § 8(f) of the Act.[4] While the statute allows an employer engaged primarily in the construction and building industry to make an agreement with a labor organization whose majority status has not been established, a clear exception bars application of the statute where the union was unlawfully "established, maintained or assisted" in violation of § 8(a). The § 8(a)(2) violation of unlawfully supporting IBEW prevents § 8(f) being of benefit to the company. See Schurr & Finlay, Inc., 149 N.L.R.B. 272, 276–277 (1964). The company also says that its recognition of IBEW occurred in August before any unlawful assistance to IBEW, and that therefore the cited exception in § 8(f) does not apply. However, we have concluded that substantial evidence supports the finding that respondent's recognition of IBEW did not occur until September 16 when several acts of unlawful assistance to IBEW occurred following the IAM recognition demand. On September 16 the Board found that there was a combination of acts of unlawful support of IBEW—recognition, negotiations and assistance in getting IBEW

---

4. § 8(f) of the Act, 29 U.S.C. § 158(f), provides in pertinent part:

"(f) It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement * * *."

**56**

cards signed. Since the closely related events show that IBEW was unlawfully "established, maintained or assisted" in violation of § 8(a), the provisions of § 8(f) do not apply.

 We conclude that none of the contentions by respondent justify setting aside the finding of an unlawful refusal to bargain in violation of § 8(a) (5). There is substantial evidence supporting the finding that the company in bad faith declined to recognize IAM in order to destroy its majority status and to substitute IBEW as the bargaining representative of its garage employees. Thus the finding of a § 8(a) (5) violation should be sustained.

Lastly the company argues that the Board exceeded its powers by installing IAM as exclusive representative of the garage employees. It says that a real question of representation existed involving two rival unions so that the company was required to remain neutral and not to recognize IAM and that, therefore, the Board should not have ordered the company to bargain with IAM, relying on the doctrine of Midwest Piping & Supply Co., 63 N.L. R.B. 1060 (1945). It is contended that the Board should have merely ordered cessation of assistance to IBEW, as the Examiner recommended. However, the Board found that the *Midwest Piping* doctrine does not apply. For there to have been a real question of representation there must have existed a reasonable basis for the company to believe that IAM lacked majority status. See National Labor Relations Board v. Swift and Co., 294 F.2d 285, 287 (3d Cir. 1961); Retail Clerks Union, Local 770 v. National Labor Relations Board, 370 F.2d 205, 207–208 (9th Cir. 1966). The Board concluded that since respondent acted in bad faith in declining to recognize IAM and since IBEW was merely present as an assisted Union, *Midwest Piping* was inapposite. There was substantial evidence to support the Board's determination on the issue, and we accept that determination. See National Labor Relations Board v. Swift and Co., supra.

For the reasons stated we conclude that the finding by the Board of a violation of § 8(a) (5) should not be set aside. However, in connection with its cease and desist order the Board has suggested that the case be remanded to consider whether the remedial bargaining order was an appropriate remedy in the light of the *Gissel* decision. We agree that such consideration by the Board is appropriate. Accordingly, the findings of violations of § 8(a) (1) and § 8(a) (2) are sustained and an appropriate order of the Board limited to such violations will be presently enforced on specific request of the Board if filed with the Clerk of the Court within 30 days, otherwise enforcement is presently denied without prejudice; the finding of a § 8(a) (5) violation is sustained and the case is remanded to the Board for further consideration of the appropriate remedial order in view of the unfair labor practices found, and in the light of National Labor Relations Board v. Gissel Packing Co., Inc., supra.