## LONGMOOR CORPORATION v. CREEDON.
### No. 406.

United States Emergency Court of Appeals.

Heard at St. Louis May 13, 1947.

Decided June 11, 1947.

Rehearing Denied July 8, 1947.

748

Before MARIS, Chief Judge, and Mc-ALLISTER and LINDLEY, Judges.

Fred A. Eppenberger, of St. Louis, Mo. (Dave L. Cornfeld, of St. Louis, Mo., Walter Freedman, of Washington, D. C., and Salkey & Jones, of St. Louis, Mo., on the brief), for complainant.

. Eli A. Glasser, of Boston Mass. (Edwin D. Dupree, Jr., Charles P. Liff, of Washington, D. C., and Herbert Lipsitz, of Boston, Mass., on the brief), for respondent.

LINDLEY, Judge.

Complainant owns a housing project purchased from the Federal Housing Administration known as Manhassett Village located in Richmond Heights, Missouri, a suburb of the city of St. Louis. It seeks to set aside an order of the Temporary Controls Administrator dated January 20, 1947, denying its protest of an order of the Regional Administrator entered May 23, 1946, refusing an upward adjustment of rent schedules for the property.

The project consists of seven three-story buildings containing 354 dwelling units, consisting of 60 apartments of three rooms and 294 of four rooms. The construction, begun in February, 1938, by a corporation known as Manhassett Village Corporation, was financed by the New York Life Insurance Company under a Federal Housing Administration guaranteed loan. The property was ready for occupancy in February 1939, upon an original rental scale, approved by FHA of $15 per room per month.

The Press criticized the undertaking and financial interests protested its wisdom. The improvement being located in a relatively remote district, the then owner experienced great difficulty in procuring tenants. As a result of various factors, none of which seem important in disposition of the issues involved, the project resulted in default by the original owner and foreclosure by the insurance company within a year after the buildings had opened for occupancy. FHA took over the property under its guarantee in March, 1940. It reduced the rent on April 1, 1940 and again on June 1, 1940 to the final average of $11.88 per room. In the opinion of realtors in St. Louis, this was 10 per cent below rentals prevailing for comparable accommodations in the community at the time. By late 1940, 65 per cent of the apartments had been rented. At that time FHA considered increasing rents but decided, in view of the extensive improvement program then under way, inconveniencing tenants, to delay any increase until the spring of 1941 when the improvement program would be completed.

Extensive improvements were made in the year 1941, including grading the streets and reconstruction of a road which runs through the village, necessitating displacement of many tons of earth, involving the use of steam shovels and use of heavy construction equipment and trucks. Streets and sidewalks were torn up. Dirt and dust contributed to the tenants' inconvenience and annoyance. As the construction work progressed, some tenants gave up their leases and others made demands for rental decreases. As the improvement neared completion, the Administration took up the question of increasing the rental schedule but, in view of the fact that it was a federal agency, determined that it would not attempt any increase in the face of the national defense program. Such was the situation early in 1942, the average rental being then still $11.88.

Early in 1942 FHA solicited bids for sale of the property. Complainant became the successful bidder and took over the title, paying $20,000 in cash and executing a mortgage to FHA to secure the balance of the purchase price, $1,772,000, the contract of sale providing that FHA would consent to complainant's raising the rent to $15 a month per room.

Complainant received the property shortly after March 1, 1942. No apartments were rented subsequent to April 1, 1942 upon the then existing rental basis. On April 15, 1942 complainant announced an increased schedule, which fixed the rental at an average price of $13.09 per room. When rent control was instituted, this increase became ineffective and rents were rolled back to those existing March 1, 1942 Thereupon, complainant filed a petition seeking approval of its schedule announced April 15, 1942, of $13.09 per room, basing its petition for relief upon the fact that, since the former rental first became effective, a capital improvement of $170,000 had been made and upon the further averment that a "special relationship" between landlord and tenants existed. The Administrator denied the prayer for relief on the ground of special relationship but permitted an upward adjustment to compensate for the improvement, raising the rent from $11.88 to $12.75 per room.

This situation continued until March 13, 1946, some three years after entry of the order granting the petition for adjustment and approximately two years after OPA had added to the regulation the provision for relief where "peculiar circumstances" are proved. Section 5(a) 11, Amendment 29 effective July 17, 1944. This amendment provides that if the rents on the date determining maximum rent were materially affected by peculiar circumstances and as a result the rents were lower than those generally prevailing in the area for comparable housing accommodations on that date, they may be increased through adjustment proceedings. On March 13, 1946 complainant petitioned for further upward adjustment on the ground that the rents in the base period had been materially affected by peculiar circumstances and as a result were substantially lower than those generally prevailing in the area for comparable housing accommodations. It relied, in support of this prayer for relief, upon allegations, first, that unfavor-

able publicity had resulted in low occupancy rate and consequent necessary reduction of rents; second, that on June 1, 1940, FHA, in order to attract tenants and overcome the effect of the publicity and the then existing large percentage of vacancies, had established a special bargain rental value of $11.88 per room per month to attract new tenants; third, that the road construction portion of the improvement program had caused such inconvenience to the tenants during the spring and summer of 1941 that any contemplated increase to normal rent became impossible, and, finally, that when most of the road construction work had been completed, FHA had considered making an increase but had determined not to do so because of the national housing emergency and defense program. It prayed for establishment of an average rental of $15 per room per month. The petition was denied by the Rent Director and, after affirmance by the Regional Administrator, complainant filed its protest.

 In support of its claim of proof of existence of peculiar circumstances, complainant relies upon proof of the derogatory publicity given to alleged financial machinations of the original owner, the local criticism of the project as an unnecessary addition to the supply of rental housing, the alleged improper activities of the project's plumbing contractor and other public criticism of the entire undertaking. An examination of each of these factors, so far as proof of the same exists in the record, is convincing that this adverse publicity grew out of the debatable question of the advisability of the project as an expenditure of federal funds. The comment in the Press concerned largely this controversial issue in American political economy and, to a lesser extent, the alleged inherent weakness of the undertaking in its location and finance. A careful examination of the articles discloses that they referred in no way to the inadequacy or lack of desirability of the apartments as proper housing units. Complainant's evidence discloses no causal connection between the publicity and the vacancies. One of the witnesses affirmatively established that the inability to rent, far from being due to adverse publicity, was due to the in-

herent undesirability and the physical condition of the property and its units. He said the truth was that the project was in such condition physically that the apartments could not be filled; hence the rent was reduced from $15 to $11.88 average per room. Though the rent was reduced to $11.88, in order, as complainant contends, to attract immediate occupancy and to fill the vacancies as quickly as possible, it was not until December, 1941, more than a year and a half afterwards, that maximum occupancy was realized. The Administrator directs attention to evidence in the record that the original scheduled rents were abnormally high because of inflated capitalization, and produced an occupancy ratio of little more than 16 per cent, that is, 60 out of 354 units; that on the lowering of rates, this occupancy doubled, resulting in 86 per cent for the three-room units as against 20 per cent for the four-room units; that, while the three-room units filled rapidly, those of four rooms required an inordinate length of time for achievement of complete occupancy, despite aggressive advertising, and that the rental history of all the units revealed an astounding rapid turnover of tenants. With this and other evidence in the record, we think the Administrator properly determined that complainant had failed to sustain the burden of bringing itself within the limits of the special adjustment provision by any proof of ill effects from adverse publicity. At any rate the evidence being in dispute and there being substantial evidence to support either a negative or an affirmative ultimate conclusion, we are without right to disturb the Administrator's finding.

 We pass to complainant's second averment of peculiar circumstances,—namely, that the inconvenience entailed by the road construction inevitably affected the rents that could be charged. It is clear that the temporary inconvenience occasioned to tenants by that work was restricted to the spring and summer of 1941 and that the road construction was virtually completed by the end of August, 1941. Consequently the effect of inconvenience must be limited to the spring and summer of 1941. The evidence is that FHA did not contemplate any increase in rental prior

to completion of the improvement program, which, obviously, was designed to remedy the inherent unmarketability of the units. The proof is further that the $12.82 rental fixed at the time of the first reduction was subsequently adjusted downward to $11.88 in order to take care of certain apartments which experience revealed to be less desirable than others. This is reflection of determination of the market value of the accommodations. The unusual turnover and the long time required to reach maximum occupancy, despite the schedule, we think, show an experiment to determine what the market value of the premises was, and, just as in the case of the adverse publicity, if the construction work did, early in the history, have any derogatory effect upon the marketability of the units, those effects obviously disappeared by the time all the improvements had been completed, so, even if the tenants were subjected to inconvenience in the summer of 1941, by the time the improvements had been completed, that undesirable effect had been removed. When we reach the rent fixing basic period, March, 1942, we find the property improved by the expenditure of $172,000 by correction of the grade of streets, paving, landscaping, planting trees and shrubs, construction of tennis courts and similar improvements. The premises were then, everybody seems to agree, in a position utterly relieved of these two alleged factors of peculiar circumstances. With the property thus improved, with free bus transportation to the main lines, the project was then in position apparently to compete with other comparable housing accommodations. So, if the circumstances related ever constituted peculiar circumstances, which the Administrator did not believe, and whose finding we say is supported by substantial evidence, the effect of those circumstances had been removed by the time complainant acquired the property.

Complainant relies upon another suggestion—in this respect, namely, that FHA said that it did not attempt to raise the rent because it desired to contribute to the federal defense program. We think this has no significance whatsoever so far as the issues presented to us are concerned. That fact is merely a reflection of a civic attitude which in no wise affects the rents that complainant voluntarily fixed for the property.

The realistic feature of the situation is that when complainant acquired this property and, for the first time, was able to fix freely, in the open market, rentals for the property, though the FHA had said it would not resist a schedule of $15 per room per month, complainant voluntarily fixed $13.09 as the average rental per room. There were no restrictions upon it at that time; it was a free agent dealing in an open market. The proper rental at that time, if we are to accept the figure fixed by itself of its own volition, was $13.09. That schedule would have prevailed, had it not been for the fact that control of rents came into existence. Thereupon the rents were rolled back to the $11.88, the average rental per room existing in March, 1942. Subsequent events indicate that complainant received fair consideration. It immediately filed with the Administrator an application for adjustment upon the basis that it was entitled to an increase over $11.88 because of a capital improvement. We have mentioned that the Administrator, upon consideration, agreed, but that instead of fixing the increased rental at $13.09 as contended by complainant, the Administrator fixed it at $12.75 per room, only 34¢ less per room than complainant had requested. Three years later the present application came, in an attempt to prove that complainant is entitled to an additional rental over and above that to which it was entitled because of capital improvement, because of peculiar circumstances. Clearly the early history is a clouded one, but it would seem clear that the circumstances surrounding the original incorporation, the adverse publicity, and the inconvenience during the improvement period have seen their day and come to an end. We doubt if it can be said that they in themselves have any bearing whatsoever upon what constitutes a fair rental in March, 1942. The best evidence of such a rental was the complainant's voluntary designation of $13.-09. If complainant had been dissatisfied with the action of the Administrator in fixing the rent at $12.75, it could have filed a protest and if that was denied, a complaint in this court. This it did not do.

The evidence before the Administrator was such that we think that he was clearly justified in his findings and his conclusions. Under those circumstances we have no right to disturb the order.

Judgment will enter dismissing the complaint.

## On Petition for Rehearing.

The scope of review of decisions of administrative bodies is adequately defined in late decisions of the Supreme Court. Dobson v. Commissioner, 320 U.S. 489, 64 S. Ct. 239, 88 L.Ed. 248; Trust of Bingham v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670, 163 A.L.R. 1175; Kelley v. Commissioner, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278; Medo Photo Supply Corp. v. National Labor Relations Board, 321 U. S. 678, and cases cited in foot-note, page 681, 64 S.Ct. 830, 88 L.Ed. 1007. In Three States Lumber Company v. Commissioner, 158 F.2d 61, the Circuit Court of Appeals for the Seventh Circuit, following these decisions, held that whether, upon undisputed facts, the income there in question was realized from the sale of land held primarily for sale to customers, was a question of law for the court, namely, whether the applicable statute was such as to preclude the decision of the tax court. So, here, whether the facts appearing in the present record constitute peculiar circumstances within the meaning of the pertinent statute, in view of the enunciations of the Supreme Court, may well be a question of law. Upon that branch of the case, because of the facts related in the opinion and those appearing in this record, we were and are of the opinion that the Administrator's conclusion that there had been no satisfactory proof of the existence of peculiar conditions within the meaning of the statutes, was not arbitrary but was a correct conclusion under the statute, and that we could not say, upon the facts as they are disclosed, as a matter of law, that he acted without sanction of law or that his decision was not in accordance with law, and therefore, arbitrary and capricious, but that, on the contrary, the facts fall short of peculiar circumstances within the meaning of the statute. To that opinion, we adhere.

 There is, however, a further question which seems to us, under the reasoning of the Supreme Court decisions, purely one of fact, namely, whether, if we be wrong in our determination that the Administrator held, in accord with law, that the facts did not prove such peculiar circumstances, and if, as a matter of law, we should say that they did constitute peculiar circumstances, they materially affected the rents of complainant. The Board of Review found that none of the circumstances urged, in fact, had material effect upon the bargaining relationship between the landlord and its tenants or materially affected the rents. This question is one of proof, one of fact, and upon that, as we have pointed out, there is substantial evidence to support the conclusion of the Administrator that none of the circumstances materially affected the rents or bargaining relationship between the landlord and its tenants. With the determination of fact in this respect, clearly, we have no right to interfere. Indeed, were we a fact finding tribunal, we would be compelled to arrive at the same result.

We might add that, as we pointed out, the evidence is clear that if peculiar circumstances ever existed and if they ever had any material effect upon complainant's rents, that effect had long since come to an end before the effective date of rent control.

We have given consideration to all other suggestions of complainant in its petition for rehearing, and, upon such consideration, the petition is denied.